[Cite as *State v. Montgomery*, 2021-Ohio-1831.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

STATE OF OHIO,                  :        Case No. 19CA3679

    Plaintiff-Appellee,        :

v.                              :        <u>DECISION AND</u>
                                         <u>JUDGMENT ENTRY</u>

KAREN MONTGOMERY,               :

    Defendant-Appellant.       :        **RELEASED 5/26/2021**
_____
<u>APPEARANCES</u>:

Paul Giorgianni, Giorgianni Law L.L.C., Columbus, Ohio, for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for appellee.
_____
Hess, J.

{¶1}   Karen Montgomery appeals her conviction, following a jury trial, for tampering with evidence.  In her first assignment of error, Montgomery contends that her conviction is not supported by sufficient evidence.  We agree.  After viewing the evidence in a light most favorable to the prosecution, we conclude that no rational trier of fact could have found all of the essential elements of the crime proven beyond a reasonable doubt.  Accordingly, we sustain the first assignment of error, reverse the trial court's judgment, and remand to the trial court for entry of a judgment of acquittal.  This decision renders moot the remaining assignments of error, so we need not address them.

I.  FACTS AND PROCEDURAL HISTORY

{¶2}   The Ross County grand jury indicted Montgomery on one count of tampering with evidence in violation of R.C. 2921.12(A)(2) and one count of unlawfully

disturbing a body in violation of R.C. 313.11.  The matter proceeded to a jury trial at which Jamie Thomas testified that his fiancée, Juanita Payne, had an allergic reaction to penicillin that resulted in heart surgery that led to kidney problems.  Payne's doctors said there was nothing more they could do for her, and on April 22, 2017, she began to receive home hospice care through Heartland Hospice.  Thomas testified that he knew Payne was dying.  He testified that on April 25, 2017, a chaplain came to the house and had a private conversation with Payne.  Tina Parsley, a Heartland nurse's aide, came to bathe Payne, who was swollen and sore because dialysis via a catheter in her right internal jugular vein had been discontinued.  Payne mentioned being in pain, and there was a discussion about changing a bandage where the catheter protruded from her neck because it had dried blood on it and tape around the bandage was in her hair.  Parsley did not have the authority to administer pills or change the bandage and called for a nurse to come.

{¶3}    Thomas testified that Montgomery responded, and while trying to change the bandage, asked Parsley for scissors.  Payne told Thomas that she loved him and asked him to make sure her children knew that she loved them.  Thomas said he would, heard a "snip," and saw blood "shooting across" her neck.[1]  He got lightheaded, went outside, and collapsed.  At some point, his sister, Rose Cochenour, asked him about hemostats (instruments used to prevent the flow of blood from an open blood vessel by compression of the vessel) Payne had in the house.  Thomas could not remember if he went inside and got the hemostats or if his sister went inside with him and got them.  However, he did not reenter the house until his sister told him that Payne had passed

---

[1] We have changed trial transcript quotes from all capital letters to lowercase letters for ease of reading.

away.  After Payne died, Thomas aided cleanup efforts by providing the location of empty trash bags, and he gave instructions for bagged items to be placed in a bathtub.  Later, someone put the bags in a dumpster, but Thomas retrieved them and put them in vacuum-sealed containers which he gave to his attorney about a week later.  He did not disturb the contents of the bags but recalled that his sister went through them to locate things and got sick to her stomach from the odor.

{¶4}  Cochenour testified that after Montgomery arrived, she gave Payne morphine, and Payne requested a second dose.  During Payne's bed bath, Montgomery tried to remove the heavily-taped bandage with her fingers but then asked Parsley for scissors.  At some point, Thomas said, "Oh god no," and ran outside.  Cochenour followed, and after he told her what had happened, she went back inside to see if she could help and saw Montgomery and Parsley on cell phones.  Cochenour went outside again to check on Thomas, and when she reentered the house, she saw Payne "take her last breaths."  Cochenour offered to get Montgomery hemostats and went outside and told Thomas that Payne had passed and that Montgomery wanted the hemostats.  They reentered the house, Thomas got the hemostats, and Cochenour gave them to Montgomery.  Cochenour helped Montgomery and Parsley wash Payne's body and told them to put bags of bloody items in a bathtub.  Cochenour later moved the bags to a dumpster but helped Thomas retrieve them the next day.  She denied opening the bags.

{¶5}  Parsley testified that she went to Payne's home to drop off supplies but noticed that Payne was struggling to breathe and that her color was off.  Payne reported breathing trouble and pain, and Parsley, who cannot administer medication, called for a nurse.  Montgomery responded and gave Payne morphine, and she requested a second

dose.  Payne told Thomas she loved him and was sorry she was dying.  She "kept saying she was dying" and said she "didn't want to die awake."  During Payne's bed bath, Thomas talked about changing the bandage.  Montgomery tried to remove it with her fingers, but later had Parsley get her scissors.  At that time, Payne was responsive but was more "grayish" and "purplish looking."  Parsley became aware that Montgomery cut the catheter and saw her apply pressure to the area with her hands through a towel. Parsley told a detective that Montgomery used the hemostats after Payne died.  However, Parsley testified that she did not know if Payne was dead at that time and is not trained to make that determination.  Parsley testified that Montgomery did not pronounce Payne dead until she applied the hemostats and listened to Payne's heart with a stethoscope. Afterwards Parsley bathed Payne's body, helped Montgomery bag up items, and put the bags in a bathroom.  Someone from a funeral home came and removed Payne's body.

{¶6}     Stephanie McGinnis, senior administrator at Heartland, testified that the day Payne died, she spoke to Parsley and Montgomery about the cut catheter and went to the scene. On the way, McGinnis called Dr. Dirk Juschka and advised him of the circumstances of Payne's death.  McGinnis did not call the coroner.  She testified that generally when a home hospice patient dies in Ross County, the death must be reported to the coroner via a hospice death report form that is usually faxed the next day.  McGinnis suggested there is a different requirement for accidental deaths but did not elaborate on it.  McGinnis also testified that Heartland nurses and STNAs must make reports about patient visits which are used internally and are not forwarded to the coroner's office. Montgomery made two reports about Payne's death because an "as needed visit" became a "death visit."  On April 25, 2017, at 9:15 p.m., Montgomery signed a Visit Note

Report for a "RN HOSPICE DEATH AT HOME" visit.  Under "INDICATE TIME OF DEATH

CONFIRMED," she wrote "4/25/17 @ 5:45PM."   Under "INDICATE NOTIFICATIONS

COMPLETED BY THE AGENCY (MARK ALL THAT APPLY)," Montgomery marked that

the coroner had been notified.  Her report did not mention the cut catheter.  On April 26,

2017, at 8:32 p.m., Montgomery signed a Visit Note Report for a "SN HOSPICE

SUBSEQUENT VISIT."  The report included the following narrative:

> STNA TINA PRESENT AND ASSISTING NURSE TO GIVE PT A BED
> BATH.  PT SUDDENLY BECAME ANXIOUS AND REPEATING TO
> FIANCE [sic] "I'M SORRY JAMIE, I LOVE YOU.  TELL THE KIDS I LOVE
> THEM.  GIVE ME SOME MORPHINE I AM SCARED TO DIE I WANNA DIE
> IN MY SLEEP."  GIVEN ROXANOL 5MG.  PT FIANCE [sic] JAMIE
> REQUESTED RN CHANGE DRESSING ON DIALYSIS CATHETER IN
> LEFT NECK.  DRESSING WAS HANGING OFF, INSERTION SITE OPEN
> TO AIR.  PT SUDDENLY BECAME NONRESPONSIVE AND
> RESPIRATIONS CHANGED TO CHEN [sic] STOKES.  ATTEMPTING TO
> REMOVE DRESSING WHICH HAD MULTIPLE LAYERS OF TAPE
> ADDED TO IT AND ACCIDENTLY CUT INTO LINE. PRESSURE APPLIED
> UNTIL NURSE COULD PINCH LINE OFF WITH FINGERS THEN LINE
> WAS CLAMPED WITH HEMOSTATS AND BLEEDING WAS STOPPED.
> PT BLED ENOUGH TO WET LESS THAN HALF OF A TOWEL AND AN
> AREA ON HER PILLOW.  PT RESPIRATION SHALLOW.  PT CYANOTIC
> AND EXPIRED AT 5:45PM WITH HOSPICE NURSE, STNA AND
> FIANCES [sic] SISTER PRESENT AT BEDSIDE.

{¶7}   Tonja Helmick, a patient care coordinator at Heartland, testified that when

a hospice patient dies at home in Ross County, the coroner must receive a hospice death

report form within 24 hours.  The form requests information on the patient's terminal

diagnosis and signs of or recent history of trauma, indicates the form should be faxed to

the coroner's office "ASAP," and gives instructions to contact the "investigator on call for

release of the body" "[i]f anything appears suspicious or if trauma related, recent or past."

Helmick testified it is "usually" the nurse at the scene's responsibility to send the form, but

it is also part of her job duties.   On average, she completes the form once or twice a

month for patients she did not witness pass. Helmick completed a form for Payne's death indicating there was no sign of or recent history of trauma, and she faxed it to the coroner on April 26, 2017, at 2:36 p.m. Helmick testified that she was not aware of the cut catheter at that time. She used the April 25th report to complete the form but not the April 26th report, which had not been completed yet. Sometimes, Helmick calls a nurse if the nurse's report does not provide enough information to complete the form, but Helmick could not recall whether she talked to anyone who had been at the scene before sending the form on Payne's death. When asked why she sent the form even though the April 25th report indicated the coroner had already been notified, Helmick testified: "It's just something that we do. He requires this form every time regardless of what happens."

{¶8} Attorney Michael Warren testified that on May 8, 2017, Thomas contacted him because he thought Payne's death certificate stated the wrong cause of death. A week later, Warren retrieved vacuum-sealed bags of evidence from Thomas's home and stored them at his office. Warren encouraged the coroner to open an investigation, and a detective and representative from the coroner's office collected the bags. Warren filed a civil action related to Payne's death on behalf of her estate, her father, Thomas, and Cochenour.

{¶9} Michael Ratliff, chief investigator at the Ross County Coroner's Office, testified that his duties include determining whether reported deaths are under the coroner's jurisdiction, and if so, investigating to assist the coroner and determine the cause and manner of death. Ratliff testified that unnatural, suspicious, and unusual deaths are under the coroner's jurisdiction and "whoever has knowledge" of such a death "is suppose[d] to immediately notify" the coroner's office, prior to the body being disturbed.

On cross-examination, he acknowledged that by statute, only attending physicians and members of an ambulance service, emergency squad, or law enforcement agency must provide notice. Ratliff testified that hospice care providers must report all deaths under their care to the coroner via a form and need to provide notice of natural deaths within a reasonable time. On April 26, 2017, the coroner's office received the form Helmick faxed, which did not alert Ratliff to the need for an investigation. If the office had been immediately notified of the cut catheter, he would have gone to the scene and examined Payne's body. About a month after Payne died, Ratliff opened an investigation into her death, which included obtaining records like Montgomery's reports, seeking the opinion of a forensic pathologist, and helping Detective Stanley Addy of the Ross County Sheriff's Office document evidence collected from Warren. Ratliff testified that the evidence he saw was inconsistent with Montgomery's statement in the April 26th report about the amount of blood loss.

{¶10} Dr. Charles Lee, deputy coroner and chief forensic pathologist at the Licking County Coroner's Office, testified that the Ross County Coroner's Office hired him to review Payne's case. Based on photos of items from the scene and records concerning Payne's health, he opined that she experienced a "significant amount of bleeding." Dr. Lee testified that although Payne was probably within days or weeks of dying when Montgomery cut the catheter, he did not think Payne would have died when she did "if she had not bled."

{¶11} Dr. John Gabis testified that in 2017, he was the Ross County Coroner, who is a public official. A death certificate completed by Dr. Juschka stated the immediate cause of Payne's death was renal failure, due to cardiogenic shock, due to right

ventricular failure, due to idiopathic pulmonary arterial hypertension, and the manner of death was natural. Dr. Gabis found the cause of death was hemorrhagic shock due to the cutting of the dialysis catheter, and the manner of death was accident. A supplemental death certificate was issued that reflected his verdict. Dr. Gabis testified that Payne's "many comorbidities" impacted the amount of blood loss needed for her to experience hemorrhagic shock, and based on photos of items from the scene, he opined that she lost a "large amount" of blood.

{¶12} Detective Addy testified that the coroner's office contacted the Ross County Sheriff regarding Payne's death, and he began an investigation into the matter. He believed the Ohio Board of Nursing and Ohio Department of Health also investigated. Detective Addy collected bags of evidence from Warren, and he and Ratliff photographed their contents. Detective Addy also interviewed witnesses and testified that Dr. Juschka said if he had had "all the information * * * he would have rendered a different decision" on cause of death.

{¶13} At the close of the state's case-in-chief, the court denied Montgomery's Crim.R. 29(A) motion for a judgment of acquittal. Subsequently, Dr. Juschka testified that he has had a contractual relationship with Heartland for eight years. In April 2017, as team physician, his responsibilities included being available to nurses by phone and preparing death certificates when requested by a funeral home. By statute, he can certify only natural deaths. He testified that usually when a patient dies, he gets notice of the death and surrounding circumstances via a phone call from the nurse who assessed the patient. On April 25, 2017, he communicated with Montgomery about Payne's medical condition, medications for her comfort, a change in her code status to "D.N.R." (do-not-

resuscitate), and her death. Montgomery told him about the cut catheter. Dr. Juschka did not notify the coroner's office about Payne's death or direct anyone at Heartland to do so. Sometime after Payne's death, Dr. Juschka and Montgomery attended a regular Heartland meeting on patients at which Payne's available records were discussed. Dr. Juschka testified that when he prepared the death certificate, he believed that Payne's death was natural and that the catheter cutting was "coincidental" because she "was going to pass anyway." He admitted that he prepared the death certificate before he saw photos of items from the scene and that he told Detective Addy they depicted more blood than he would have expected based on what had been reported to him. However, he testified that the photos did not alter his opinion on cause of death, and he disagreed with the decision to change it.

{¶14} Montgomery testified that she had been a nurse at Heartland but is currently employed there in a different capacity. Montgomery was asked to visit Payne because she was in distress. When Montgomery arrived, Payne was "in a lot of pain" and exhibiting "signs of impending death." Montgomery gave her morphine, and at some point, her code status changed to "D.N.R.C.C." (do-not-resuscitate comfort care). Payne declined "rapidly," became "very anxious," and told Thomas that she loved him, to make sure her boys knew that she loved them, that she knew she was dying, and that she was sorry. Montgomery gave her more morphine, and at Thomas's request, tried to change her bandage. She could not get the tape off with her hands, used scissors, and accidentally cut the catheter. She put pressure on the area using her hands and a towel and had Parsley call McGinnis and hold the phone while she explained what had happened. At some point, she stopped the bleeding by pinching the catheter with her

fingers, and she applied hemostats to it. Montgomery testified that before she cut the catheter, Payne was unresponsive and had Cheyne-Stokes respirations—a type of breathing seen right before death. After Montgomery cut the catheter, Payne stopped breathing, and once Montgomery applied the hemostats, her hands were free to use her stethoscope to check for a heartbeat and call time of death.

{¶15} Montgomery communicated with McGinnis and Dr. Juschka and helped Parsley perform typical post-mortem care for a hospice patient, i.e., bathe Payne, change her clothes and linens, bag up stained items, and ask the family where to put them. Montgomery did not think to call the coroner. Although cutting the catheter was unusual, she believed Payne was dying when she arrived, and her death was natural. Montgomery testified that in visit notes, she always indicates that the coroner has been notified of a Ross County home patient death because a death report form must be sent to the coroner within 24 hours. However, Montgomery never sent the form and did not offer Helmick information to complete it because she "didn't know at the time that [Helmick] was filling that paper out." When Montgomery made the April 26th report, she believed the blood loss reported was accurate, and she testified that the towel she bagged did not look like a towel depicted in a photograph the state had introduced.

{¶16} After the defense rested, the court denied Montgomery's renewed Crim.R. 29(A) motion. The jury found her guilty of tampering with evidence but not guilty of unlawfully disturbing a body. She made a Crim.R. 29(C) motion for a judgment of acquittal and a Crim.R. 33(A)(4) motion for a new trial. The court denied the motions and sentenced her to five years of community control.

## II.  ASSIGNMENTS OF ERROR

{¶17}  Montgomery assigns the following errors for our review:

1. The conviction is not supported by sufficient evidence.

2. The conviction is contrary to the manifest weight of the evidence.

3. The uncertainty as to whether or not all twelve jurors believed that Nurse Montgomery violated the statute on April 25 by making the check-mark and the uncertainty as to whether or not all twelve jurors believed that Nurse Montgomery violated the statute on April 26 by writing the narrative violated Nurse Montgomery's right to a unanimous jury verdict and her right to be convicted only upon proof beyond a reasonable doubt as to every fact necessary to constitute a criminal conviction.

4. Prosecutorial misconduct during opening statement and closing argument violated Nurse Montgomery's right to a fair trial.

5. Nurse Montgomery was denied effective assistance of counsel.

6. The aggregate prejudice of the foregoing errors violated Nurse Montgomery's right to a fair trial.

## III.  SUFFICIENCY OF THE EVIDENCE

{¶18}  In the first assignment of error, Montgomery contends that her conviction is not supported by sufficient evidence.  Montgomery asserts that the prosecution argued to the jury that she tampered with evidence when she made the April 25, 2017 report and indicated the coroner had already been notified of Payne's death and tampered with evidence when she made the April 26, 2017 report and supposedly indicated that she applied the hemostats before Payne died and misrepresented the amount of blood loss. Montgomery maintains that the evidence does not give rise to an inference beyond a reasonable doubt that: (1) she made either report knowing a Ross County proceeding or investigation into Payne's death was in progress or was about to be or likely to be instituted; (2) she made the April 25th report with purpose to mislead a county official; (3)

the April 26th report asserted that she applied the hemostats before Payne died, she made such an assertion knowing it to be false, or she made such an assertion with purpose to mislead a county official; and (4) her statement about blood loss in the April 26th report was false, she made the statement knowing it to be false, or she made it with purpose to mislead a county official. Montgomery asserts that because it is unknown how many jurors voted to convict based on each report, if there is insufficient evidence to support a conviction based on either report, due process and double jeopardy principles require that we vacate her conviction and enter a judgment of acquittal.

{¶19} In reviewing the sufficiency of the evidence for a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4, 684 N.E.2d 668 (1997), and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness." *State v. Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 13. "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Musacchio v. United States*, 577 U.S. 237, 243, 136 S.Ct. 709, 193 L.Ed.2d 639 (2016), quoting *Jackson* at 319. A reviewing court will not overturn a conviction based on insufficient evidence " 'unless reasonable minds could not reach the conclusion that the trier of fact did.' " *State v. Cook*, 4th Dist. Gallia No. 18CA11,

2019-Ohio-4745, ¶ 15, quoting *State v. Bradshaw*, 4th Dist. Scioto No. 17CA3803, 2018-Ohio-1105, ¶ 15.   If the evidence is legally insufficient, "the Double Jeopardy Clause precludes a second trial"; the "only 'just' remedy available" is "the direction of a judgment of acquittal."  *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.E.2d 1 (1978).

**{¶20}**  R.C. 2921.12, the statute on tampering with evidence, states:

(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

* * *

(2) Make, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation.

**{¶21}**  The trial court defined purposely and knowingly for the jury:

Purposely.  A person acts purposely when it is the person's specific intention to cause a certain result.

Knowingly.  A person acts knowingly, regardless of his or her purpose, when he or she is aware that his or her conduct will probably cause a certain result.  A person has knowledge of circumstances when he or she is aware that such circumstances probably exist.

Knowingly means that a person is aware of the existence of the facts and that his or her acts will probably cause a certain result.

Since you cannot look into the mind of another, knowledge is determined from all of the facts and circumstances in evidence.  You will determine from these facts and circumstances whether there existed at the time in the mind of the defendant an awareness of the probability that an official proceeding or investigation was in progress or was about to be or likely to be instituted.

*See generally* R.C. 2901.22(A) (defining "purposely"); R.C. 2901.22(B) (defining "knowingly").  "[C]onstructive knowledge is insufficient to prove that [an accused] knew

that an investigation was ongoing or likely to be commenced * * *." *State v. Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449, 49 N.E.3d 1248, ¶ 25.

### A. The April 25, 2017 Report

**{¶22}** There is insufficient evidence that Montgomery tampered with evidence when she made the April 25, 2017 report, which falsely indicated that Heartland had notified the coroner of Payne's death.

**{¶23}** There is no evidence that Montgomery made the April 25th report knowing that an official proceeding or investigation was in progress. The bill of particulars specified that the official proceeding or investigation that Montgomery had the requisite knowledge of was "a Ross County investigation" into Payne's death. When Montgomery made the April 25th report, no Ross County Coroner's Office investigation was in progress because the coroner did not have notice of Payne's death and facts indicating it fell under the coroner's jurisdiction, i.e., facts suggesting the death was unnatural, suspicious, or unusual. Moreover, no Ross County Sheriff's Office investigation was in progress as no one had contacted that office about any potential criminal activity.

**{¶24}** There is no evidence that Montgomery made the April 25th report knowing that a Ross County investigation into Payne's death was about to be or likely to be instituted. R.C. 2921.12(A)(2) requires proof that the defendant acted knowing an official investigation was *about to be or likely to be instituted*, not knowing that one *should be instituted*.

**{¶25}** The state presented evidence that Dr. Juschka had a statutory duty to immediately notify the coroner about Payne's death and the surrounding circumstances because they were unusual and involved an accident. *See* R.C. 313.12(A). Dr. Juschka

and Montgomery discussed the cut catheter near the time Payne died, but he did not immediately (or ever) notify the coroner or direct Montgomery or anyone else at Heartland to do so. As a result, Montgomery and others disturbed Payne's body.

**{¶26}** The state also presented evidence that Helmick had a job duty to prepare and send hospice death report forms. However, there is no evidence that Montgomery made the April 25th report knowing that Helmick was likely to send a form that would cause a coroner investigation to be instituted. It is unclear why Helmick sent a hospice death report form in this case. She testified that usually the nurse at the scene is responsible for sending the form, and in this case, that nurse (Montgomery) reported that the coroner had already been notified. Helmick's job duties may have included checking the files of deceased patients for the form, but she did not offer testimony to that effect. In any event, a form completed by Helmick was not likely to (and did not) cause the coroner to institute an investigation. Helmick indicated that she uses the nurse on the scene's report to complete the form. Because the April 25th report did not mention the cut catheter and Montgomery did not otherwise provide that information to Helmick before she sent the form, Helmick did not convey that information to the coroner's office.

**{¶27}** There is no evidence that Montgomery made the April 25th report knowing that any other individual was likely to report Payne's death to the coroner and cause the coroner to institute an investigation. Thomas, the person who instigated the coroner's investigation, was present when Montgomery accidentally cut the catheter. However, he did not request that law enforcement or the coroner come to the scene. Thomas knew that Payne was terminally ill, and there is no evidence that when Montgomery was at the scene, Thomas treated her with hostility or expressed a desire to preserve evidence, have

the coroner determine Payne's cause of death, or pursue a civil action for the hastening of Payne's death.

{¶28} There is no evidence that Montgomery made the April 25th report knowing that a Ross County Sheriff's Office investigation was about to be or likely to be instituted. "[K]nowledge of a likely investigation may be inferred when the defendant commits a crime that is likely to be reported." (Emphasis deleted.) *Cook*, 4th Dist. Gallia No. 18CA11, 2019-Ohio-4745, at ¶ 19, quoting *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 118. There is no evidence that Montgomery committed a crime when she accidentally cut the catheter, and the jury acquitted her of unlawfully disturbing Payne's body after she cut the catheter.

{¶29} We note that during trial, Detective Addy testified that he believed the Ohio Department of Health and Ohio Board of Nursing had investigated this matter. But the bill of particulars specified that the official proceeding or investigation that Montgomery had the requisite knowledge of was "a Ross County investigation" into Payne's death, not an investigation by a state department or board. Moreover, there is no evidence that when Montgomery made the April 25th report, she knew that an official investigation by one of these entities was in progress or was about to be or likely to be instituted.

{¶30} There is no evidence that Montgomery made the April 25th report with purpose to mislead a public official or to corrupt the outcome of an official proceeding or investigation. The bill of particulars specified she acted with purpose to mislead the Ross County Coroner or to corrupt the outcome of a Ross County proceeding or investigation into Payne's death. The April 25th report was an internal Heartland document, not an official report to a public official.

**{¶31}** After viewing the evidence in a light most favorable to the prosecution, we conclude that no rational trier of fact could have found all of the essential elements of tampering with evidence proven beyond a reasonable doubt with respect to the April 25th report. Specifically, there is no evidence that Montgomery made the April 25th report knowing that an official proceeding or investigation was in progress or was about to be or likely to be instituted or that she made the report with purpose to mislead a public official or to corrupt the outcome of an official proceeding or investigation.

### B. The April 26, 2017 Report

**{¶32}** There is insufficient evidence that Montgomery tampered with evidence when she made the April 26, 2017 report, which contained information about the cut catheter, hemostats, and amount of blood loss.

**{¶33}** There is no evidence that Montgomery made the April 26th report knowing that an official proceeding or investigation was in progress. Again, the bill of particulars specified that the official proceeding or investigation that Montgomery had the requisite knowledge of was "a Ross County investigation" into Payne's death. When Montgomery made the April 26th report, the coroner had notice of Payne's death via the hospice death report form Helmick had sent. However, no Ross County Coroner's Office investigation was in progress because the form suggested the death was natural and therefore outside the coroner's jurisdiction. Moreover, no Ross County's Sheriff's Office investigation was in progress as no one had contacted that office about any potential criminal activity.

**{¶34}** There is no evidence that Montgomery made the April 26th report knowing that a Ross County investigation into Payne's death was about to be or likely to be instituted. R.C. 2921.12(A)(2) requires proof that the defendant acted knowing an official

investigation was *about to be or likely to be instituted*, not knowing that one *should be instituted*.

**{¶35}** The state presented evidence that Dr. Juschka had a statutory duty to immediately notify the coroner about Payne's death and the surrounding circumstances because they were unusual and involved an accident. *See* R.C. 313.12(A). Dr. Juschka and Montgomery discussed the cut catheter near the time Payne died, but he did not immediately (or ever) notify the coroner or direct Montgomery or anyone else at Heartland to do so. As a result, Montgomery and others disturbed Payne's body.

**{¶36}** The state also presented evidence that Helmick had a job duty to prepare and send hospice death report forms. However, there is no evidence that Montgomery made the April 26th report knowing that Helmick was likely to send a form that would cause a coroner investigation to be instituted. Montgomery made the April 26th report more than 24 hours after Payne's death, and by that time, Helmick had already sent the form, which did not trigger an investigation.

**{¶37}** There is no evidence that Montgomery made the April 26th report knowing that any other individual was likely to report Payne's death to the coroner and cause the coroner to institute an investigation. Thomas, the person who instigated the coroner's investigation, was present when Montgomery accidentally cut the catheter. However, he did not request that law enforcement or the coroner come to the scene. Thomas knew that Payne was terminally ill, and there is no evidence that when Montgomery was at the scene, Thomas treated her with hostility or expressed a desire to preserve evidence, have the coroner determine Payne's cause of death, or pursue a civil action for the hastening of Payne's death. There is also no evidence that when Montgomery made the April 26th

report, she was aware of measures Thomas had taken to preserve evidence after she had left the scene.

**{¶38}** There is no evidence that Montgomery made the April 26th report knowing that a Ross County Sheriff's Office investigation was about to be or likely to be instituted. "[K]nowledge of a likely investigation may be inferred when the defendant commits a crime that is likely to be reported." (Emphasis deleted.) *Cook*, 4th Dist. Gallia No. 18CA11, 2019-Ohio-4745, at ¶ 19, quoting *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 118. There is no evidence that Montgomery committed a crime when she accidentally cut the catheter, and the jury acquitted her of unlawfully disturbing Payne's body after she cut the catheter.

**{¶39}** We again note that during trial, Detective Addy testified that he believed the Ohio Department of Health and Ohio Board of Nursing had investigated this matter. But the bill of particulars specified that the official proceeding or investigation that Montgomery had the requisite knowledge of was "a Ross County investigation" into Payne's death, not an investigation by a state department or board. Moreover, there is no evidence that when Montgomery made the April 26th report, she knew that an official investigation by one of these entities was in progress or was about to be or likely to be instituted.

**{¶40}** After viewing the evidence in a light most favorable to the prosecution, we conclude that no rational trier of fact could have found all of the essential elements of tampering with evidence proven beyond a reasonable doubt with respect to the April 26th report. Specifically, there is no evidence that Montgomery made the April 26th report knowing that an official proceeding or investigation was in progress or was about to be or

likely to be instituted. It is unnecessary for us to address Montgomery's arguments regarding other elements of the offense with regard to the April 26th report.

### C. Conclusion

**{¶41}** There is insufficient evidence to support the conviction for tampering with evidence in violation of R.C. 2921.12(A)(2) regardless of whether it was based on the April 25, 2017 report, the April 26, 2017 report, or both reports. Accordingly, we sustain the first assignment of error, reverse the trial court's judgment, and remand to the trial court for entry of a judgment of acquittal. Our decision renders moot the remaining assignments of error, so we need not address them. *See* App.R. 12(A)(1)(c).

JUDGMENT REVERSED AND
CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS REVERSED and that the CAUSE IS REMANDED.  Appellee shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J.:  Concurs in Judgment and Opinion.
*Dorrian, J.:  Concurs in Judgment Only.


For the Court


BY: _____
        Michael D. Hess, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**

*Judge Julia L. Dorrian, Tenth District Court of Appeals, sitting by assignment of the Supreme Court of Ohio in the Fourth Appellate District.