[Cite as *State v. Allen*, 2022-Ohio-1180.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 21CA3736 |
| Plaintiff-Appellee, | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| v. | : | |
| Brian M. Allen, | : | **RELEASED 4/05/2022** |
| Defendant-Appellant. | : | |

_____
<u>APPEARANCES</u>:

Victoria Bader, Assistant State Public Defender, Office of the Ohio Public Defender, Columbus, Ohio, for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for appellee.
_____
Hess, J.

**{¶1}** Brian M. Allen appeals from a judgment of the Ross County Court of Common Pleas convicting him of two counts of gross sexual imposition. In his first assignment of error, Allen contends that the trial court committed plain error when it admitted irrelevant and prejudicial photographs. However, the court could conclude the photographs have a tendency to make it more probable that Allen caused the victim to have sexual contact with him and that their probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Because the court did not abuse its discretion, let alone commit plain error, in determining that the photographs were relevant and admissible under Evid.R. 403(A), we overrule the first assignment of error.

{¶2} In his second assignment of error, Allen contends that his convictions are against the manifest weight of the evidence. After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse its verdict. Therefore, we overrule the second assignment of error.

{¶3} In his third assignment of error, Allen contends that trial counsel provided ineffective assistance by failing to object to photographs. However, Allen failed in his burden to show that trial counsel's performance was both deficient and prejudicial. Accordingly, we overrule the third assignment of error and affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶4} The Ross County grand jury indicted Allen on two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), third-degree felonies. Count I alleged that on or about August 2, 2015, through April 1, 2017, Allen had sexual contact with another, who was not his spouse, when the other person was less than 13 years of age. Count II alleged that during the same period, Allen caused another, who was not his spouse, to have sexual contact with him when the other person was less than 13 years of age. Allen pleaded not guilty, and after the trial court overruled his motion to suppress statements he made to law enforcement, the matter proceeded to a jury trial.

{¶5} C.L. ("Mother") testified that she is the mother of L.L. (d.o.b. 8/2/12) and G.A. When L.L. was two years old, Mother met and moved in with Allen, who was Mother's boyfriend for four years and is the father of G.A. They lived in a two-bedroom, one-bathroom home on Vigo Road in Ross County. Mother and the children shared a

bedroom with Allen and his mother, and evidently Allen's grandmother used the other bedroom. One night when L.L. was two years old, Mother was in bed and heard L.L. tell Allen, "No," and yell and scream at him to leave her alone. Mother saw Allen touching L.L.'s chest over her pajamas. Mother told Allen to leave L.L. alone because Mother "was getting sleep" and "had to work in the morning." Months later, Allen came into the bathroom while Mother was bathing L.L. Allen said he had to use the restroom, and despite Mother's protests, he exposed his penis and urinated. He started "playing with" his penis and told Mother it was ok for L.L. "to play with it." Mother told him that it was "not ok for her to see it." At some point during this encounter, Mother closed the shower curtain so Allen could not see L.L. but later got her out of the tub. Mother did not contact law enforcement because she was scared that Allen "and his mom and them would do something." Mother acknowledged that she did not report Allen to law enforcement until after she and the children moved in with Mother's aunt, D.H. ("Aunt"), on August 3, 2018, and custody proceedings regarding G.A. had commenced.

{¶6} Mother testified about State's Exhibits 1-17. Exhibit 1 is a photograph of part of L.L.'s bedroom at Aunt's house. Exhibit 2 is a photograph of part of L.L.'s bed. Exhibit 3 is a photograph of another part of the bed and drawings on a wall behind it. Exhibits 4 through 7 are photographs which depict closer views of the drawings on the wall, which Mother described as including a cat with a penis near its tail, a cat with a penis in its mouth, a penis, and a boy with a penis. Exhibit 8 is a photograph of a book, which Mother testified was L.L.'s library book and found in a toybox. Exhibits 9 through 17 are photographs of nine pages in the book in which someone added what Mother described as penises to images in the book. Mother testified that she found the drawings on the

wall within weeks of moving into Aunt's house but admitted having trouble recalling dates and times.

{¶7}   Mother's cousin and Aunt's daughter, N.H. ("Cousin"), testified that in September 2018, L.L. made concerning disclosures to her.   Cousin did not know what to do, so she called a number related to sexually assaulted children and was advised to go to the sheriff's office.   Then, Cousin contacted Mother and Aunt.   They went to the Perry County Sheriff's Office but were told to go to the Ross County Sheriff's Office.

{¶8}   Aunt testified that in August 2018, Mother, L.L., and G.A. moved in with her. L.L. told Cousin "stuff that was not good about things that happened to her down there on Vigo Road," and they called a sexual abuse hotline.   They were told to go to the sheriff's office to file a report.   On September 11, 2018, they went to the Perry County Sheriff's Office but were advised to go to the Ross County Sheriff's Office.   They did so and met with Deputy Zachary McGoye.   Subsequently, Aunt saw drawings of penises in L.L.'s bedroom and told Detective Tony Wheaton about them.   Aunt initially testified that she saw the drawings about three or four months after Mother and the children moved in with her but later testified that she was "not real sure about" when she saw them.

{¶9}   Deputy McGoye of the Ross County Sheriff's Office testified that on September 11, 2018, he interviewed Mother and Aunt about sexual assault allegations. Mother claimed to have witnessed alleged events about a year prior.   Deputy McGoye forwarded the information he gathered to his supervisor.

{¶10}   Detective Wheaton of the Ross County Sheriff's Office testified that on October 4, 2018, he was assigned to the case.   On January 24, 2019, he interviewed Allen for 30 to 40 minutes in Allen's kitchen.   Allen denied any sexual involvement with

L.L., denied touching her vaginal area for any reason, and disclosed that he recently started taking medication for anxiety.  On July 31, 2019, Allen voluntarily came to the Ross County Sheriff's Office for a second interview.  He again denied any wrongdoing. The interview ended after about 20 minutes because Allen said he felt ill and left.

**{¶11}** On August 15, 2019, Allen voluntarily came to the sheriff's office again for a third interview which took place in a "relatively small room" with windows looking outside.  Detective Wheaton did not record the first part of the interview because the recording equipment in the room was not operational.  Allen initially "continued with his denial."  Then he recalled a time when he inadvertently touched L.L.'s vagina while bathing her. Detective Wheaton reminded Allen that he previously denied giving L.L. baths.  Allen "changed his statement" and recalled a time when he touched L.L.'s vagina in their bedroom sometime when she was three or four years old and prior to April 1, 2017.  Allen said that they were watching television, that he was extremely intoxicated, and that for an unknown reason, he began to touch L.L.'s exposed vagina.  He was not sure whether he removed L.L.'s clothing to expose her vagina or placed his hand inside her clothing.  However, "he could clearly remember that he was rubbing the outside of her vagina."  Allen admitted that at some point, he grabbed L.L.'s hand and placed it on his exposed penis. At first, Allen "was describing a manner that is consistent with masterbation [sic]" but "quickly changed that and stated that she was just touching and holding on to it.  For an undetermined amount of time."  Detective Wheaton left the interview room with the door open for a few minutes and retrieved a recording device from his office.  He recorded the rest of the interview with Allen's permission.

{¶12} The trial court admitted into evidence a transcript of the recorded part of the interview. During that part of the interview, Allen confirms Detective Wheaton reviewed his *Miranda* rights before the interview began. Detective Wheaton reviews the rights again, and Allen confirms that he understands them. Detective Wheaton recaps statements Allen made during the first part of the interview. Allen confirms that he rubbed the outside of L.L.'s vagina and put her hand on his penis when she was three or four years old. Allen states that he did not tell the truth before because he was afraid that he would "lose everything." Detective Wheaton asks Allen to describe Detective Wheaton's treatment of him. Allen says, "Well, fair. Kind of pushy." Detective Wheaton says, "Okay. How do you feel that I was pushy?" Allen says, "I don't know you just came off that way." Detective Wheaton asks whether there is anything Allen wants him "to tell anybody," and Allen says, "Just please don't look at me badly."

{¶13} Detective Wheaton testified that later in the day after the third interview, Allen called him and begged him to drop the investigation. Allen said that he had "learned his lesson" and that "he would never touch another drop of alcohol" or "be around a young child to put himself in that situation again." A day or two later, Allen again called and begged Detective Wheaton to drop the investigation. In December 2019, Detective Wheaton learned about the drawings in L.L.'s bedroom and book.

{¶14} Julie Oates, a licensed professional clinical counselor, testified that on January 9, 2020, she was the executive director of the Child Protection Center of Ross County and interviewed L.L. L.L. "was hesitant to come back to the interview" and asked "safety questions" such as whether they could lock the doors and "keep people outside." During the interview, she was quiet, chewed her fingernails, kept her head down, made

poor eye contact, and consistently said, "I don't know."  However, L.L. told Oates that Allen "had touched her peaches with his hand," that she had seen him "touching his w[ie]ner" and "white stuff coming out," and that his "w[ie]ner touched her peaches."  On anatomical drawings, L.L. identified "peaches" as "the vaginal/genital area" and a "w[ie]ner" as "the male genitalia."  Oates made a referral for a medical examination of L.L. Dr. Kristine McCallum performed the examination on January 15, 2020, but could not recall any details of it at trial.

{¶15}  Allen testified that he voluntarily agreed to talk to Detective Wheaton three times. Allen claimed the first interview occurred in Detective Wheaton's vehicle but admitted Detective Wheaton did not threaten or hit him during it.  Allen left the second interview because he felt ill due to his anti-anxiety medication.  He admitted Detective Wheaton did not force him to stay and that he had no problem leaving.  Allen testified that he initiated the third interview because he wanted to "get some things straight" after receiving threats from L.L.'s family.  The third interview lasted about 45 minutes.  Allen admitted that before it began, Detective Wheaton asked whether he was under the influence of alcohol or drugs, and he said, "No."  But the interview room was small, and Allen felt "anxious and claustrophobic."  So "throughout the time" he was talking to Detective Wheaton, he took about eight capsules of anti-anxiety medication—more than the recommended dose.  Allen later testified that he took the capsules outside of Detective Wheaton's presence.  The medication decreased his anxiety but made him "extremely drowsy" and feel unlike himself.  Allen told Detective Wheaton that he was not feeling well and made multiple requests to end the interview, but Detective Wheaton would not let him leave.

{¶16} Allen claimed he never touched L.L. inappropriately but felt "obligated" to tell Detective Wheaton "what he wanted to hear." Allen testified that he admitted to inappropriate contact with L.L. during the third interview "[b]ecause I felt like that was the only way out. I was so anxious to get out and my stomach just wasn't agreeing with the medication. I wanted to throw up. I could feel my heart rate going up. I just wanted out of that room. I was extremely claustrophobic and I was, I just wanted out – completely out." Allen testified that he did not get out of the room until Detective Wheaton "finally got what he wanted on tape." Detective Wheaton did not hit or threaten Allen during the third interview. However, Detective Wheaton was "extremely pushy" and "aggressive." Allen claimed Detective Wheaton never left the interview room to retrieve a recorder but rather used one from a desk in the interview room. Allen denied calling Detective Wheaton and asking him to end the investigation.

{¶17} The jury found Allen guilty as charged. The trial court sentenced him to 48 months in prison on each count and ordered that he serve the sentences concurrent with one another.

## II. ASSIGNMENTS OF ERROR

{¶18} Allen assigns three errors for our review:

I.      The trial court committed plain error when it allowed the admission of irrelevant and prejudicial photographs.

II.     Mr. Allen's convictions were against the manifest weight of the evidence.

III.    Brian Allen was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution; and Article I, Section 10, Ohio Constitution.

## III.  ADMISSION OF PHOTOGRAPHS

{¶19}  In the first assignment of error, Allen contends that the trial court committed plain error when it admitted the photographs because they are irrelevant and prejudicial. Allen asserts that the drawings in the photographs were irrelevant because they "were found approximately two to three years after the alleged offenses took place," and "[t]here was no testimony connecting these drawings to the charges against Mr. Allen, no statements from L.L., and no medical opinion or expert testimony."  He asserts that even if the drawings were relevant, their probative value was substantially outweighed by the danger of unfair prejudice and confusing the jury.  According to Allen, the state sought admission of the photographs "for the sole purpose of inflaming the passions of the jury and asking them to find an unfounded causal connection between the allegations against [him] and the unrelated rudimentary drawings found in a seven-year-old's bedroom." He maintains that the photographs prejudiced him because "there is no overwhelming independent evidence of guilt" and the "highly inflammatory exhibits served to confuse the jury and assuredly resulted in the jury's finding of guilt."

{¶20}  Crim.R. 52(B) states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  To prevail under the plain error standard, "the defendant must establish that an error occurred, it was obvious, and it affected his or her substantial rights."  *State v. Fannon*, 2018-Ohio-5242, 117 N.E.3d 10, ¶ 21 (4th Dist.).  To affect the defendant's substantial rights, the error must have affected the trial's outcome.  *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22.  "The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard

for reviewing ineffective assistance of counsel claims." (Emphasis deleted.) *Id.* "But even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it * * *." *Id.* at ¶ 23. The Supreme Court of Ohio has " 'admonish[ed] courts to notice plain error "with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice." ' " (Alteration and emphasis sic.) *Id.*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶21} "The admission or exclusion of evidence generally rests within a trial court's sound discretion." *State v. McCoy*, 4th Dist. Pickaway No. 19CA1, 2020-Ohio-1083, ¶ 20. "Thus, absent an abuse of discretion, an appellate court will not disturb a trial court's ruling regarding the admissibility of evidence." *Id.* An abuse of discretion is "an unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken." *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23.

{¶22} " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence which is not relevant is not admissible." Evid.R. 402. Relevant evidence is generally admissible. Evid.R. 402. However, Evid.R. 403(A) provides that relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

**{¶23}** Unfair prejudice is not damage to the defendant's case which " 'results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.' " *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 89, quoting *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir.1986). "[I]f the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001), quoting *Weissenberger's Ohio Evidence*, Section 403.3 (2000).

**{¶24}** Evid.R. 403(A) "manifests a definite bias in favor of the admission of relevant evidence," as "[t]he dangers associated with the potentially inflammatory nature of the evidence must *substantially* outweigh its probative value before the court should reject its admission." (Emphasis sic.) *State v. Irwin*, 4th Dist. Hocking Nos. 03CA13 & 03CA14, 2004-Ohio-1129, ¶ 22. "Thus, '[w]hen determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission.' " *McCoy*, 4th Dist. Pickaway No. 19CA1, 2020-Ohio-1083, at ¶ 21, quoting *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 22.

**{¶25}** The trial court could conclude that the photographs were relevant and that their probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. One can infer that L.L. made the drawings based on their location—on the walls of her bedroom and inside her library book. The

fact that a young female child was familiar with the appearance of a penis and drew multiple penises after living with Allen has a tendency to make it more probable that he made her touch his penis than it would be without the drawings.  This is of consequence to the determination of the action because the state had to prove that Allen caused L.L. to have sexual contact with him to establish Count II.  *See* R.C. 2907.05(A)(4) (setting forth the offense of gross sexual imposition); *see also* R.C. 2907.01(B) (defining sexual contact to include touching the genitals of another for the purpose of sexually arousing or gratifying either person).  The rudimentary drawings do not have a tendency to arouse emotional sympathies, evoke a sense of horror, or appeal to an instinct to punish so as to be considered unfairly prejudicial.  Moreover, Allen has not articulated how the drawings could confuse the issues or mislead the jurors, who were aware of the time gap between the alleged offenses and drawings and that L.L. did not explain the drawings.  Therefore, we conclude that the trial court did not abuse its discretion, let alone commit plain error, in determining that the photographs were relevant and admissible under Evid.R. 403(A).  Accordingly, we overrule the first assignment of error.

## IV.  MANIFEST WEIGHT OF THE EVIDENCE

**{¶26}** In the second assignment of error, Allen contends that his convictions are against the manifest weight of the evidence. He suggests that the jury should have believed his testimony instead of his admissions.  He emphasizes his prior denials of wrongdoing and the delay in recording the third interview. Allen also emphasizes his testimony that during the third interview, he felt drowsy and unlike himself due to anti-anxiety medication, that Detective Wheaton prevented him from leaving multiple times, and that he told Detective Wheaton what he wanted to hear to escape the pressure of the

interrogation. Allen asserts that L.L.'s statements to Oates lack credibility because L.L.'s "young age calls into question her ability to accurately recall events that occurred years prior" and "her susceptibility to influence and the veracity of her disclosure." He states that it is "clear" that L.L. "struggled to discuss the allegations" and often said, "I don't know," when answering questions. In addition, Allen claims that Mother's testimony "was inconsistent, conflicting, and lacked sufficient credibility." He asserts it is suspicious that Mother did not report concerns about him until after the initiation of custody proceedings regarding G.A., which gave her a motive to lie. He notes that Mother told law enforcement she witnessed concerning behavior in 2017 but only testified about "two incidents that occurred in 2014." Allen also asserts that Mother "struggled to answer questions" and "recall dates and details."

{¶27} In determining whether a conviction is against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction.
>
> To satisfy its burden of proof, the state must present enough substantial credible evidence to allow the trier of fact to conclude that the state had proven all the essential elements of the offense beyond a reasonable doubt. However, it is the role of the jury to determine the weight and credibility of evidence. " 'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' " *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17, quoting *State v. West,* 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility.

(Citations omitted.)  *State v. Thacker*, 4th Dist. Lawrence No. 19CA18, 2021-Ohio-2726, ¶ 21-22.  "Ultimately, a reviewing court should find a trial court's decision is against the manifest weight of the evidence only in the exceptional case where the evidence weighs heavily against the decision."  *State v. Gillian*, 4th Dist. Gallia No. 16CA11, 2018-Ohio-4983, ¶ 28, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 330.

{¶28}  R.C. 2907.05(A)(4) states:  "No person shall have sexual contact with another, not the spouse of the offender [or] cause another, not the spouse of the offender, to have sexual contact with the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person."  " 'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."  R.C. 2907.01(B).  Allen does not dispute that L.L. was not his spouse and was less than 13 during the time period alleged in the indictment; rather, Allen disputes that he had sexual contact with L.L. or caused her to have sexual contact with him.

{¶29}  The jury was free to reject Allen's testimony and believe his admissions that during the time period alleged, he touched L.L.'s vagina and caused her to touch his penis.  Although Allen initially denied any wrongdoing, during the recorded part of the third interview, he admitted to lying because he was afraid of losing "everything."  The claim that Detective Wheaton pressured Allen into confessing during the third interview is undercut by several facts.  During earlier interviews when Allen denied wrongdoing, Detective Wheaton did not pressure Allen or prevent him from terminating the interviews.

Detective Wheaton never hit or threatened Allen. The third interview only lasted about 45 minutes. During the recorded part of the interview, Allen indicated that he understood that he had the right to remain silent and talk to a lawyer but still responded to questions and never asked to leave. And when Detective Wheaton asked Allen to describe Detective Wheaton's treatment of him, Allen said he was "fair" and "[k]ind of pushy" but could not articulate how Detective Wheaton had been pushy.

{¶30} The jury had no obligation to believe that Allen took an excessive amount of medication during the third interview due to anxiety and claustrophobia or was so affected by medication that he made a false confession. Allen initiated the third interview and voluntarily went to it. Although it occurred in a small room, there were windows looking outside, and there is no evidence Allen told Detective Wheaton that he felt claustrophobic or asked to move to a more spacious location. In addition, Allen's testimony that he took about eight capsules of anti-anxiety medication throughout the time he was talking to Detective Wheaton is inconsistent with Allen's later testimony that he did not take the medication in Detective Wheaton's presence.

{¶31} The jury was also free to believe L.L.'s statements. When L.L. described her interactions with Allen, she used language one might expect from a young child. The jury did not have to reject her statements merely because she was young, said she did not know the answer to some questions, and exhibited discomfort during the interview. The jury could have reasonably concluded she felt uncomfortable about recounting traumatic events to a stranger. Moreover, Allen's admissions were consistent with some of L.L.'s statements. Allen and L.L. agreed that he touched her vagina and that he caused

her to touch his penis, though L.L. indicated Allen's penis touched her vagina, and Allen told Detective Wheaton it touched her hand.

{¶32} With respect to Mother, even if her testimony about Allen's conduct was so incredible as to be unworthy of the jury's acceptance of it, the convictions would not be against the manifest weight of the evidence. As we explained above, the jury was free to believe Allen's admissions and L.L.'s statements. The jury also could reasonably infer that Allen acted for the purpose of sexually arousing or gratifying himself.

{¶33} Having reviewed the entire record, we cannot say that this is an exceptional case where the evidence weighs heavily against the convictions, that the jury lost its way, or that a manifest miscarriage of justice has occurred. Because the convictions are not against the manifest weight of the evidence, we overrule the second assignment of error.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

{¶34} In the third assignment of error, Allen contends that trial counsel provided ineffective assistance. Allen asserts counsel should have objected to the photographs under Evid.R. 402 and 403. He claims the "significant number of drawings" in the photographs were irrelevant and cumulative and that he suffered prejudice "because the jury was shown and asked to consider irrelevant, highly  inflammatory photographs."

{¶35} To prevail on an ineffective assistance claim, a defendant must show: "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Failure

to satisfy either part of the test is fatal to the claim.  *See Strickland* at 697.  The defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.E. 83 (1955).  "Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance of counsel." *In re Wingo,* 143 Ohio App.3d 652, 668, 758 N.E.2d 780 (4th Dist.2001).

**{¶36}** Trial counsel was not ineffective for failing to object to the photographs under Evid.R. 402 or Evid.R. 403(A).  It appears trial counsel did not object to the photographs because counsel had a strategy to discredit the state's theory of the case by showing that the penises in the drawings did not look like Allen's penis because he was uncircumcised.  Regardless whether this was a sound strategy, as we explained in Section III, the trial court could conclude that the photographs were relevant and that their probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  Therefore, an objection under Evid.R. 402 or 403(A) would have been futile.  "[T]he failure to make a futile objection does not constitute deficient performance for an ineffective assistance of counsel claim." *State v. Cordor*, 2012-Ohio-1995, 969 N.E.2d 787, ¶ 29 (4th Dist.).

**{¶37}** Trial counsel was also not ineffective for failing to object to the photographs on the ground that they were cumulative.  Evid.R. 403(B) states:  "Although relevant,

evidence may be excluded if its probative value is substantially outweighed by considerations of * * * needless presentation of cumulative evidence." " 'Cumulative evidence' is additional evidence of the same kind to the same point." *Kroger v. Ryan*, 83 Ohio St. 299, 94 N.E. 428 (1911), syllabus. Even if trial counsel was deficient for not objecting to the number of photographs under Evid.R. 403(B), Allen has not demonstrated a reasonable probability that the cumulative nature of the photographs affected the outcome of the trial. The Supreme Court of Ohio has stated that " '[a]bsent gruesomeness or shock value, it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal.' " *State v. Smith*, 80 Ohio St.3d 89, 109, 684 N.E.2d 668 (1997), quoting *State v. DePew*, 38 Ohio St.3d 275, 281, 528 N.E.2d 542 (1988). In this case, the rudimentary drawings are not gruesome or shocking so as to warrant a finding that the admission of 17 photographs, instead of some lesser number, prejudiced Allen.

{¶38} Allen has not shown that trial counsel's failure to object to the photographs on any ground he advances on appeal was both deficient performance and prejudicial. Because Allen failed in his burden to establish trial counsel's ineffectiveness, we overrule the third assignment of error.

## VI. CONCLUSION

{¶39} Having overruled the assignments of error, we affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the ROSS COUNTY COURT OF COMMON PLEAS to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
       Michael D. Hess, Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**