[Cite as *State v. Kolle*, 2022-Ohio-4322.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 21CA8 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND</u><br><u>JUDGMENT ENTRY</u> |
| John Lamar Kolle,[1] | : | |
| Defendant-Appellant. | : | **RELEASED 12/02/2022** |

_____

<u>APPEARANCES</u>:

John Lamar Kolle, Columbus, Ohio, pro se appellant.

Judy C. Wolford, Pickaway County Prosecutor, Circleville, Ohio, for appellee.
_____

Hess, J.

{¶1}   John Lamar Kolle appeals from a judgment of the Pickaway County Court of Common Pleas convicting him of aggravated trafficking in drugs (Count Nine) and engaging in a pattern of corrupt activity (Count One).  Kolle contends that there is insufficient evidence to support his convictions and that the trial court erred when it allowed testimony concerning money allegedly recovered during the execution of a search warrant at his apartment and admitted into evidence a photograph of that money. For the reasons that follow, we conclude that there is sufficient evidence to support the conviction on Count Nine, but not Count One.  We also conclude that the trial court did not abuse its discretion when it admitted the photograph.  But the court did abuse its

---

[1] Appellant capitalizes the "m" in his middle name in his appellate briefs.  In this decision, we have spelled his name as it appears in the judgment entry from which he appeals.

discretion in allowing testimony about where the money in the photograph was found, which was not based on personal knowledge. The state has not met its burden to show this error did not affect Kolle's substantial rights. Thus, we affirm in part and reverse in part the trial court's judgment, vacate the convictions, and remand for the trial court to enter a judgment of acquittal on Count One and conduct a new trial on Count Nine.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  The Indictment

{¶2}    On November 7, 2019, the Pickaway County grand jury returned a 14-count indictment against Kolle and two others. The indictment charged Kolle with seven counts: (1) engaging in a pattern of corrupt activity on or about September 1, 2019, through October 23, 2019 (Count One); (2) aggravated trafficking in drugs on or about September 17, 2019 (Count Five); (3) aggravated possession of drugs on or about September 17, 2019 (Count Six); (4) aggravated trafficking in drugs on or about September 18, 2019 (Count Seven); (5) aggravated possession of drugs on or about September 18, 2019 (Count Eight); (6) aggravated trafficking in drugs on or about September 24, 2019 (Count Nine); and (7) aggravated possession of drugs on or about September 24, 2019 (Count Ten). Each count carried a forfeiture specification. After Kolle pleaded not guilty, the court dismissed Counts Seven and Eight on the state's motion, and the matter proceeded to a jury trial.

### B.  The Evidence

#### 1.  Testimony of Detective Sergeant Alan Lewis

{¶3}    Detective Sergeant Alan Lewis of the Ross County Sheriff's Office testified that he is assigned to the U.S. 23 Major Crimes Task Force. In 2019, Angela Auten

agreed to be a confidential informant for the task force and gave Det. Lewis a list of people she knew who trafficked drugs, which included James Shea. Auten introduced Shea to Det. Lewis, who was working undercover. Det. Lewis testified about four videotaped controlled buys he made from Shea at a Love's truck stop in Pickaway County using money supplied by Lieutenant John Strawser.

{¶4}    The first buy was initially scheduled for September 1, 2019, but Shea was stopped by police. His passenger, who was not Auten, hid the drugs, and the buy was rescheduled for September 3, 2019. Auten accompanied Shea to the buy. Det. Lewis testified that he was supposed to buy "a couple of ounces of methamphetamine" from Shea for $1,000. On the video footage, Det. Lewis can be heard counting out the money and asks when Shea is "gonna be good again." Shea says, "I gotta feel him out first before I * * * re-up," but then states, "I can get it elsewhere." Det. Lewis testified that Exhibit 3—a photograph of a clear bag containing a substance—depicted the methamphetamine he bought from Shea and gave Lt. Strawser for processing. According to a laboratory report from the Ohio Bureau of Criminal Investigation ("BCI"), the "crystalline substance" weighed 55.29 grams and was "found to contain Methamphetamine."

{¶5}    On September 5, 2019, Det. Lewis and Lt. Strawser went to Columbus with Auten for the purpose of having her identify the location of Shea's supplier. Auten pointed out an apartment complex near "Cleveland and Radnor." She identified the supplier's apartment building and pointed out two different apartments, but Det. Lewis could not recall whether one of them was Kolle's apartment, which law enforcement later raided.

{¶6}   The second buy occurred on September 17, 2019.  Prior to the buy, Det. Lewis and Lt. Strawser met with the Franklin County Sheriff's Office Special Investigations Unit ("SIU") to get assistance with identifying the supplier.  Shea came to the buy alone. Det. Lewis testified that he was supposed to buy three ounces of methamphetamine from Shea for $2,200, but during the buy, Shea told Det. Lewis he only had an ounce and sold it to Det. Lewis for $500.  On the video footage, Det. Lewis asks Shea, "Your phone not working?"  Shea says, "No, it's off right now," and he needs "Wi-Fi to make a call."  Det. Lewis asks Shea whether he got "the stuff," and Shea says, "I got one."  Det. Lewis says, "You only got one?"  Shea says that his "boy freaked out" and "got spooked" because an "undercover ran through his parking lot taking pictures and shit."  Shea mentions that he was "up there" since 10:00 a.m. and went to a McDonald's to try to get a signal to try to call "him."  At one point, Det. Lewis says that he was "hoping for a bunch more" but asks Shea, "How much for the one?"  Shea says, "Five,"  and later in the footage, Det. Lewis counts to five.  Shea tells Det. Lewis he will "try again" and that Shea has "another guy" he "can go through."  Later, Shea says, "I just went up there for no reason, you know what I mean, cause I had that already.  I already had that.  I was gonna add two more to it." Det. Lewis testified that Exhibit 6—a photograph of a clear bag containing a substance on top of an evidence bag which describes the evidence as a "Crystal Like Substance"— depicted the methamphetamine he bought from Shea and gave Lt. Strawser for processing.  However, Det. Lewis admitted that he did not test or weigh the substance.

{¶7}   The third buy occurred on September 18, 2019.  Auten accompanied Shea. Det. Lewis testified that he was supposed to buy two ounces of methamphetamine from Shea for $1,000 and that the exchange occurred.  On the video footage, Det. Lewis can

be heard counting out the money. Det. Lewis tells Shea he needs "four to six" more ounces the next week, and Shea says he may need the cash upfront. Shea says, "I'll talk to him" and "get all that in the works." Later, Det. Lewis asks, "Will your dude be good for that?" Shea says, "Should be." Det. Lewis asks what "his deal" was yesterday. Shea says, "He was fucking paranoid." Shea explains that "he" complained that Shea called too early and "changed places" and said that right before Shea "pulled in a fuckin' undercover pulled through his parking lot and was taking pictures of his place and his vehicle and shit." Shea makes an indiscernible comment, and Det. Lewis asks whether "this stuff came from the same guy." Shea says, "Yeah." Det. Lewis says, "So what did you do go back up again?" Shea says, "Yeah," and that he "made two trips up there yesterday." Det. Lewis says, "Well he should have made gave you a fuckin' discount then [sic]," and Shea says, "He should have, but he didn't." Det. Lewis testified that to his knowledge, Auten was not with Shea when he purchased the drugs sold to Det. Lewis that day. Det. Lewis testified Exhibit 7—a photograph of what appears to be a clear bag containing a substance on top of an evidence bag which describes the evidence as a "Crystal Substance"—depicted the methamphetamine he bought from Shea and gave Lt. Strawser for processing. However, Det. Lewis admitted he did not test or weigh the substance.

{¶8} The fourth buy occurred on September 24, 2019. Det. Lewis testified that he was supposed to buy six ounces of methamphetamine from Shea for $2,800. Det. Lewis testified that around 4:40 p.m., he met Shea and Auten and gave Shea $2,800, but Shea did not give him drugs in return at that time. On the video footage, Det. Lewis counts out the money and asks if Shea is going with his "regular guy" or "someone

different."  Shea says it will be the "same guy," that he "cut me a little slack on this," and that if you "buy more than four he cuts a little slack."  Shea says he will return in "an hour and a half tops."  However, Shea and Auten did not return to Love's to complete the exchange until around 8:30 p.m.  On the video footage, Shea explains the delay occurred because, "I had to wait for him. He had to go pick it up and come back."  Shea mentions Columbus, and Det. Lewis says that it sounds like Shea has "a good guy up there you can go with."  Shea agrees.  Det. Lewis testified that Exhibit 8—a photograph of a white bag on top of an evidence bag which describes the evidence as a "Crystal Like Substance"—depicted the methamphetamine he bought from Shea and gave Lt. Strawser.  Det. Lewis admitted he did not "measure" the drugs.  Det. Lewis testified that after Kolle's arrest on September 25, 2019, Det. Lewis made one more large purchase of drugs from Shea, who got those drugs from a "different source."

2. Testimony of Lieutenant John Strawser

{¶9}    Lt. Strawser of the Pickaway County Sheriff's Office testified that in September 2019, he was assigned to the task force.  He testified that prior to a narcotics purchase, the buy money is photographed or the serial numbers on it are logged.  Lt. Strawser identified photographs of the buy money used in the four controlled buys from Shea, which the trial court admitted into evidence.  Lt. Strawser testified that after a buy, he photographs the evidence purchased, and it is sealed in a bag and submitted to BCI for testing and weighing.  At one point during Lt. Strawser's testimony, defense counsel objected "to continuously calling these items 'drugs' and 'narcotics' " because it had "not been determined," and the trial court agreed the term "substance" should be used.

{¶10} Lt. Strawser testified about three additional events related to the controlled buys. On September 5, 2019, he went to Columbus with Det. Lewis and Auten for the purpose of identifying Shea's supplier. They went to the intersection of Cleveland Avenue and Radnor Road. There was an apartment complex with two-story buildings with five or six apartments on each story. They were able to identify the supplier's building, but not the exact apartment. Auten said that she thought the supplier lived in Apartment C, but that she "was parked down the road." Through later surveillance, law enforcement learned the suspected supplier—Kolle—lived in Apartment A.

{¶11} On September 17, 2019, Lt. Strawser participated in a surveillance operation with SIU in the vicinity of Kolle's apartment. Auten was supposed to be coming there with Shea, and the goal of the operation was to witness Shea purchase drugs from Kolle and then sell them to Det. Lewis at a controlled buy later in the day. However, Shea came to Columbus without Auten. Shea drove to a McDonald's and sat there for a while on his phone. At some point, Kolle caught one of the surveillance team members trying to take a picture of his vehicle and drove around in a manner typical of drug traffickers who think they are under surveillance. Later, Shea and Kolle met in an alley behind the apartment complex. Afterwards, Shea went to another McDonald's and then met Det. Lewis.

{¶12} On the morning of September 25, 2019, law enforcement officers executed a search warrant at Kolle's apartment. Strawser testified that Kolle was taken into custody and that his apartment and vehicles were searched. The prosecutor asked Lt. Strawser, "And what did you find," and defense counsel objected on the ground that there was "no basis" for what Lt. Strawser "was about to testify to." The court stated, "Well, I'm going to

wait. Lay the foundation." The prosecutor then asked Lt. Strawser, "Did you find anything that related to Pickaway County," and Lt. Strawser testified, "Yes, we did." Defense counsel objected and stated that he would like to know if Lt. Strawser "found it" and "has personal knowledge." The court overruled the objection. Lt. Strawser testified that $2,030 of the September 24th buy money was found. The prosecutor asked to approach Lt. Strawser with Exhibit 12, a photograph of money and an evidence bag. Defense counsel objected to the photograph because it was "not the original," "not the best piece," and "a copy." The court overruled the objection. Lt. Strawser identified the photograph as being of "the $2,030 of buy money that we had taken from Mr. Kolle," which Lt. Strawser determined from the serial numbers.

{¶13} Later, Lt. Strawser testified that for safety reasons, he was across the street from Kolle's apartment when the money was found. He testified the apartment was very small, and about 15 members of the Franklin County SWAT team went inside. The SWAT team removed Kolle from the apartment, and the "Franklin County Sheriff's Office" told Lt. Strawser the money was found on Kolle—in his wallet and pants pocket. Lt. Strawser testified that he "would imagine" SWAT team members and SIU detectives handled the money before he did. He acknowledged the "chain of custody" notes on the evidence bag in Exhibit 12 state "Phillips" gave him the money, but Lt. Strawser suggested that was not the case and that Officer Phillips's name was only on the bag because he was "the case agent." At the request of defense counsel, Lt. Strawser reviewed an affidavit related to the search which was not admitted into evidence and then testified that some money was found on a table in the apartment and that according to Officer Phillips, no money was found on Kolle's person. Lt. Strawser testified that the money was counted at the

SIU office "[d]irectly after the search."  Detective Elise Hardee put the wallet in a bag and took it to the office.  He was present when Det. Hardee went through the money in the wallet, and he saw the serial numbers on the money as it was extracted from the wallet.  They "compared the buy money -- the pictures of the buy money to the pictures of the money in [Kolle's] wallet."  Defense counsel later objected to Exhibit 12 again, stating:

> There was a clear break in the chain of custody.  These are not the originals.  These are unclear photocopies.  The State had the originals.  They chose to dispose of the originals before I could ever review them.  This was not self-authenticated.  It does not say on there the time and date and location that this money was retrieved.  It's simply a rough photocopy of cash.  And there is a serious break in the chain of custody.

The court overruled the objection and admitted the exhibit.

### 3.  Testimony of Angela Auten

{¶14}  Auten testified that she has a misdemeanor criminal record.  She agreed to be an informant for money, maybe $2,000 in total, and to "get out of" charges for interference with custody, contributing to the delinquency of a minor, and violating probation.  She was a drug user at the time and agreed to participate in controlled buys from Shea, her friend and regular dealer whom she had sold methamphetamine for in the past.  In September 2019, Auten accompanied Shea on trips to Kolle's apartment in Columbus to buy methamphetamine.  Auten had seen Kolle at Shea's home once and knew he "was the dope man." However, she never talked to Kolle or entered his apartment.  During the trips, she waited in a truck and saw Shea walk up the stairs of an apartment building and return about 10 minutes later.  Although she did not witness any transactions between Shea and Kolle, she overhead phone calls between them, and Shea told her "what he was doing."

{¶15} Auten initially testified that she was present for the September 3rd controlled buy and that the drugs came from Kolle. But on cross-examination, she admitted that she was not sure whether she was present that day. Auten could not recall the events of September 17th and 18th. She testified that she was present for the September 24th controlled buy. After the money exchange, she and Shea went to Kolle's apartment and then to Love's "to give the dope" to Det. Lewis. When asked if she was involved in any transactions on October 23rd she testified: "Probably. I don't know. I don't know the dates. I do not remember the dates." Later, she testified that she was present for a buy on that date and that the drugs came from Kolle. Defense counsel said, "Do you not recall Lamar Kolle was in jail on October 23rd?" Auten said, "Okay. If we went to Columbus to buy dope, then we had bought from him. I'm telling you."

### 4. Testimony of Detective Elise Hardee

{¶16} Det. Hardee of the Franklin County Sheriff's Office SIU testified that on September 17, 2019, she assisted Det. Lewis and Lt. Strawser with surveillance for a narcotics transaction near Cleveland Avenue and Radnor Avenue. She saw Kolle exit Apartment A on the second floor of an apartment building and meet Shea in an alley. She "observed an exchange," but was parked one street over from the alley and could not tell what was exchanged or whether both men had something to exchange.

### C. The Verdict and Sentencing

{¶17} Prior to resting its case, the state moved to dismiss Counts Six and Ten, i.e., the remaining aggravated possession of drugs counts, because the court would not let the state introduce laboratory reports related to those offenses. The court granted the motion to dismiss. At some point, the state also moved to dismiss the forfeiture

specifications, and the court granted that motion as well. Kolle made a Crim.R. 29(A)

motion for judgment of acquittal on the remaining charges, which the trial court denied.

Thus, the court instructed the jury on Counts One, Five, and Nine. The jury found Kolle

not guilty of Count Five, but guilty of Counts One and Nine. The trial court denied Kolle's

post-verdict motion for judgment of acquittal and sentenced him.

## II.  ASSIGNMENTS OF ERROR

**{¶18}**  Kolle presents three assignments of error[2]:

I.  The state presented insufficient evidence to support all of the essential elements of the charges of a first-degree engaging in a pattern of corrupt activity conviction in violation of R.C. 2923.32(A)(1) beyond a reasonable doubt, and appellant's conviction for engaging in a corrupt activity therefore violates his rights to due process.

II.  The state presented insufficient evidence to support all of the essential elements of the charges of a first-degree aggravated trafficking in drugs conviction in violation of R.C. 2925.03(A)(1)/(C)(1)(e) beyond a reasonable doubt. Therefore, the appellant's conviction violates his right to due process * * *.

III.  The court erred in allowing Detective Strawser's testimony concerning money allegedly recovered in the search of appellant's apartment and in admitting State's Exhibit 12, the photograph of that money, because Det. Strawser did not have personal knowledge of the search and [seizure] and the exhibit was not properly authenticated.

For ease of discussion, we review the assignments of error out of order.

## III.  SUFFICENCY OF THE EVIDENCE

**{¶19}**  In reviewing the sufficiency of the evidence for a conviction, "[t]he relevant

inquiry is whether, after viewing the evidence in a light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime proven

beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991),

---

[2] The assignments of error are taken from the Table of Contents of the appellant's brief. There are slight variations in how they are stated in other parts of the brief.

paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  "[T]he reviewing court considers all the evidence admitted against the appellant at trial."  *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 80, citing *Lockhart v. Nelson*, 488 U.S. 33, 40-42, 109 S.Ct. 285, 102 L.E.2d 265 (1988).  "[W]e must consider whether the evidence that the state offered and the trial court admitted, whether the trial court admitted the evidence erroneously or not, would have been sufficient to sustain a guilty verdict."  *State v. Dotson*, 2018-Ohio-2481, 114 N.E.3d 390, ¶ 64 (7th Dist.).

{¶20} "A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness."  *State v. Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 13.  "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' "  *Musacchio v. United States*, 577 U.S. 237, 243, 136 S.Ct. 709, 193 L.Ed.2d 639 (2016), quoting *Jackson* at 319.  "A conviction that is based on legally insufficient evidence constitutes a denial of due process."  *State v. Bradford*, 4th Dist. Adams No. 11CA928, 2013-Ohio-480, ¶ 13.  And "[i]f the evidence is legally insufficient, 'the Double Jeopardy Clause precludes a second trial'; the 'only "just" remedy available' is 'the direction of a judgment of acquittal.' "  *State v. Montgomery*, 4th Dist. Ross No. 19CA3679, 2021-Ohio-1831, ¶ 19, quoting *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.E.2d 1 (1978).

## A.  Aggravated Trafficking in Drugs

{¶21}  In his second assignment of error, Kolle contends that the state presented insufficient evidence to support his conviction on Count Nine, aggravated trafficking in drugs on or about September 24, 2019.  Kolle acknowledges one can traffic by selling or offering to sell a controlled substance, but asserts the state "alleged a direct sale where drugs were recovered and subjected to testing."   He claims that pursuant to *State v. Chandler*, 109 Ohio St.3d 223, 2006-Ohio-2285, 846 N.E.2d 1234, as clarified in *Garr v. Warden, Madison Corr. Inst.*, 126 Ohio St.3d 334, 2010-Ohio-2449, 933 N.E.2d 1063, the state had to prove there was a detectable amount of a relevant controlled substance in what it recovered.  Kolle claims the state failed to prove the identity and weight of the substance recovered because the trial court did not admit the laboratory report related to it, and the state conceded its failure when it dismissed Count Ten. Kolle suggests *Chandler* precludes the use of circumstantial evidence to prove Count Nine and that R.C. 2925.03(I) does not impact *Chandler* as evidenced by *Garr*, *State v. Davis*, 2017-Ohio-495, 85 N.E.3d 136 (12th Dist.); and *State v. Siggers*, 9th Dist. Medina No. 09CA0028-M, 2010-Ohio-1353.  He also directs our attention to *State v. Bledsoe*, 5th Dist. Stark No. 2003CA00403, 2004-Ohio-4764.  In addition, Kolle asserts that the state failed to present even circumstantial evidence that he sold or offered to sell a controlled substance.  He maintains that there is no evidence he made a verbal offer to sell methamphetamine, knew of or participated in Shea's offer to sell to Det. Lewis, presented drugs for acceptance, or represented the substance at issue to be methamphetamine.

1. Relevant Statutory Provisions

**{¶22}** R.C. 2925.03(A)(1) states: "No person shall knowingly * * * [s]ell or offer to sell a controlled substance * * * [.]" The trial court instructed the jury that the term "sell" included "delivery, barter, exchange, transfer or gift, or offer thereof, and each such transaction made by any person, whether as principal, proprietor, agent, servant, or employee." *See* R.C. 3719.01(U) (defining "sale" in a similar manner); *see also* R.C. 2925.01(A) (stating that as used in R.C. Chapter 2925, "sale" has the same meaning as in R.C. 3719.01). The trial court instructed the jury that the term "offer" meant "to present for acceptance or rejection."

**{¶23}** R.C. 2925.03(C)(1) states that "[i]f the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II, * * * whoever violates division (A) of this section is guilty of aggravated trafficking in drugs." R.C. 2925.03(C)(1)(e) makes the offense a first-degree felony "[i]f the amount of the drug involved equals or exceeds fifty times the bulk amount but is less than one hundred times the bulk amount." R.C. 2925.03(I) states: "As used in this section, 'drug' includes any substance that is represented to be a drug." The trial court instructed the jury that methamphetamine is a schedule II controlled substance and that the bulk amount is three grams.

2. Inapposite Authority

**{¶24}** *Chandler* is inapposite. In *Chandler*, at separate trials, juries found co-defendants guilty of trafficking in cocaine in violation of prior versions of R.C. 2925.03(A)(1) and 2925.03(C)(4)(g). *Chandler*, 109 Ohio St.3d 223, 2006-Ohio-2285, 846 N.E.2d 1234, at ¶ 4. Although testing revealed the substance offered as crack

cocaine was baking soda, *id.* at ¶ 3, both juries found that the amount of the drug involved equaled or exceeded 100 grams of crack cocaine, *id.* at ¶ 4.  The Supreme Court of Ohio explained that "a person can be convicted for offering to sell a controlled substance in violation of R.C. 2925.03(A)(1) without actually transferring a controlled substance to the buyer," so there was "no doubt" that the "convictions can stand despite the fact that the substance offered as crack cocaine was actually baking soda."  *Id.* at ¶ 9.  However, the issue was "whether R.C. 2925.03(C)(4)(g), the specific section relating to major-drug-offender penalties, provides a penalty for offering to sell crack cocaine when the substance offered as crack cocaine does not actually contain *any* detectable amount of the drug."  (Emphasis sic.)  *Id.*

{¶25} The court explained that "[t]he General Assembly has authorized a hierarchy of criminal penalties for drug trafficking based upon the identity and amount of the controlled substance involved."  *Id.* at ¶ 18.  "By the terms of the penalty statute for cocaine, R.C. 2925.03(C)(4), the substance involved in the violation is to *be* cocaine or, at the very least, 'a compound, mixture, preparation, or substance *containing* cocaine.' " (Emphasis sic.)  *Id.* at ¶ 18.  "This language presumes that a detectable amount of cocaine is present within the substance before the penalty enhancement applies."  *Id.*  Thus, "[a] substance offered for sale must contain some detectable amount of the relevant controlled substance before a person can be sentenced as a major drug offender under R.C. 2925.03(C)(4)(g)."  *Id.* at syllabus.  The defendants could not be sentenced under that provision because the "finding that the amount of the drug equaled or exceeded 100 grams of crack cocaine was contrary to fact, for the substance involved was 130.87 grams of baking soda."  *Id.* at ¶ 16.

{¶26} In *Garr*, the Supreme Court of Ohio considered the following certified

question of state law from a federal court:

> "Whether the Supreme Court of Ohio's decision in *State v. Chandler* * * *
> extends to cases where the substance offered for sale was never observed,
> tested, or recovered to ascertain whether it contained a detectable amount
> of the controlled substance, but no affirmative evidence was presented to
> call into question the defendant's representation in his offer to sell, or to
> refute the jury's factual finding, that the substance was in fact a controlled
> substance in an amount that equaled or exceeded 1000 grams."

*Garr*, 126 Ohio St.3d 334, 2010-Ohio-2449, 933 N.E.2d 1063, at ¶ 1. The Supreme Court

answered the question in the negative and clarified "*Chandler* does not extend to cases

where a substance offered for sale is not recovered or tested in order to ascertain whether

it contains a detectable amount of a controlled substance." *Id.* at ¶ 2. The court explained:

> *Chandler* did not address the principle that the state can establish
> any element of any crime through circumstantial evidence. As we stated in
> *State v. Jenks* (1991), 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492, "there
> is but one standard of proof in a criminal case, and that is proof of guilt
> beyond a reasonable doubt. This tenet of the criminal law remains true,
> whether the evidence against a defendant is circumstantial or direct."
>
> Our decision in *Chandler* that a substance offered for sale must
> contain "some detectable amount" of the relevant controlled substance
> before a person can be sentenced as a major drug offender is limited to
> those cases where the substance offered for sale is recovered and
> subjected to testing to determine whether it contains a detectable amount
> of the drug offered for sale. It does not apply to situations where no drug is
> recovered and no testing is performed. Hence, where an offender offers to
> sell a controlled substance in a quantity that would implicate the MDO
> specification, and where no substance is ever recovered or
> tested, *Chandler* is factually distinguishable, as it is a counterfeit drug case
> where the alleged drug was recovered and tested.
> Therefore, *Chandler* does not apply to the situation as presented here
> where [the defendant] offered to sell a drug that was not recovered. In such
> a case, the offender may be convicted of an MDO specification in a properly
> proven case.

*Id.* at ¶ 27-28.

**{¶27}** *Chandler*, as clarified by *Garr*, does not support the conclusion that because the state recovered and tested the substance at issue in Count Nine, it could not have proven the elements of R.C. 2925.03(A)(1) and (C)(1)(e) unless test results showing a detectable amount of methamphetamine had been admitted into evidence. As *Garr* observed, "*Chandler* did not address the principle that the state can establish any element of any crime through circumstantial evidence." *Garr* at ¶ 27. Moreover, *Chandler* recognized that "a person can be convicted for offering to sell a controlled substance in violation of R.C. 2925.03(A)(1) without actually transferring a controlled substance to the buyer." *Chandler*, 109 Ohio St.3d 223, 2006-Ohio-2285, 846 N.E.2d 1234, at ¶ 9. The problem in *Chandler* arose because the penalty provision required proof that the substance offered for sale contained cocaine, and testing showed the substance in that case was baking soda. *Id.* at ¶ 3, 18.

**{¶28}** In this case, no test results were admitted into evidence showing whether the substance at issue in Count Nine was methamphetamine or not, and unlike the penalty provision in *Chandler*, R.C. 2925.03(C)(1)(e) does not require proof that the substance offered for sale contains the relevant controlled substance. R.C. 2925.03(C)(1)(e) applies "[i]f the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II" and "[i]f the amount of the drug involved equals or exceeds fifty times the bulk amount but is less than one hundred times the bulk amount." However, "[e]ffective September 30, 2008, the General Assembly amended R.C. 2925.03 to include subsection (I)," presumably "in response to *Chandler*." *Siggers*, 9th Dist. Medina No. 09CA0028-M, 2010-Ohio-1353, at ¶ 13. R.C. 2925.03(I) defines "drug" to include "any substance that is represented to be a drug." Thus, the state

did not need to prove the substance it recovered contained methamphetamine to secure a conviction under R.C. 2925.03(A)(1) and (C)(1)(e).

**{¶29}** *Bledsoe, Garr*, *Davis*, and *Siggers* do not support a contrary conclusion. *Bledsoe* was one of the decisions *Chandler* reviewed, see *Chandler* at ¶ 6-7, and was decided before the enactment of R.C. 2925.03(I).  *Garr* did not consider R.C. 2925.03(I) and had no reason to do so because it took effect after the trafficking offense in that case occurred, and the certified question of state law did not address it.  *See Garr*, 126 Ohio St.3d 334, 2010-Ohio-2449, 933 N.E.2d 1063, at ¶ 1, 5.  *Davis* did not consider R.C. 2925.03(I).  *Siggers* did and found it modified R.C. 2925.03 such that certain penalty provisions of the statute could be implemented when a substance is represented to be crack cocaine and no detectable cocaine is in the substance.  *Siggers* at ¶ 13.

**{¶30}** Kolle emphasizes the fact that *Siggers* vacated a sentence on a trafficking count for which the jury found the amount of crack cocaine involved was equal to or greater than five grams but less than ten grams.  *Id.* at ¶ 21.  The defendant had promised to sell 10.5 grams of crack cocaine but evidence indicated he actually sold 4.6 grams of crack cocaine.  *Id.* at ¶ 20. *Siggers* interpreted the penalty provision at issue "to mean that an actual amount of a substance must exist rather than a purely hypothetical promise of a volume of drugs that may or may not exist."  *Id.* at ¶ 19.  Thus, the jury's finding was contrary to the evidence, and the enhanced sentence rested on insufficient evidence.  *Id.* at ¶ 21.  Contrary to what Kolle suggests, *Siggers* does not support the conclusion that in a case such as this where test results exist but are not admitted, R.C. 2925.03(I) does not apply and the state cannot prove its case via circumstantial evidence.

### 3. Evidentiary Analysis

**{¶31}** After viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of R.C. 2925.03(A)(1) and (C)(1)(e) proven beyond a reasonable doubt with respect to Count Nine, aggravated trafficking in drugs on or about September 24, 2019. During the September 18th controlled buy, Det. Lewis told Shea he needed four to six ounces of methamphetamine the following week. Shea indicated that he would reach out to his supplier and made comments from which one can infer he is referring to Kolle. Shea talked about how his supplier was paranoid the day before, i.e., the day of the surveillance operation, because he saw an undercover officer taking pictures. This had caused Shea to be two ounces short during the September 17th controlled buy. Shea agreed with Det. Lewis that the supplier should have given Shea a discount for having to make a second trip to get the "stuff" sold to Det. Lewis during the September 18th controlled buy.

**{¶32}** After the September 18th controlled buy, Det. Lewis made a deal with Shea to buy six ounces of methamphetamine for $2,800. Lt. Strawser testified that there are 28.349 grams in an ounce, which meant the deal was for 170.094 grams of methamphetamine. There is evidence that on September 24, 2019, around 4:40 p.m., Det. Lewis met Shea and Auten at Love's and gave Shea the money. When Det. Lewis asked Shea if he was going with his "regular guy" or "someone different," Shea said it would be the "same guy" and indicated the supplier had agreed to give a discount because he "cuts a little slack" in deals for more than four ounces.

**{¶33}** Auten testified that after the money exchange, she and Shea went to Kolle's apartment in Columbus. Even though Auten did not witness any transaction between

Shea and Kolle or see the exact apartment Shea went to, she saw Shea go up the stairs of an apartment building and return about 10 minutes later. Auten previously identified this two-story building for Det. Lewis and Lt. Strawser, and surveillance confirmed Kolle lived on the second floor. Although Kolle challenges Auten's credibility, an evaluation of witness credibility is not proper in a sufficiency of the evidence review. *Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, at ¶ 79. When Shea and Auten returned to Love's, Shea gave Det. Lewis a white bag containing a crystal-like substance and agreed with a comment Det. Lewis made about Shea having a "good guy" in Columbus. There is evidence that law enforcement found $2,030 of the money from the September 24th controlled buy during the execution of a search warrant the next morning at Kolle's apartment, on Kolle (in his wallet and pants pocket) and on a table. Although Kolle challenges the admissibility of this evidence, in a sufficiency of the evidence review, we must consider all evidence the state offered and the trial court admitted, regardless whether the admission was erroneous. *Dotson*, 2018-Ohio-2481, 114 N.E.3d 390, at ¶ 64.

{¶34} Based on the foregoing, any rational trier of fact could have found that on or about September 24, 2019, Kolle knowingly sold or offered to sell methamphetamine and that the amount of the drug involved equaled or exceeded 50 times the bulk amount but was less than 100 times the bulk amount. Because sufficient evidence supports the conviction on Count Nine, we overrule the second assignment of error.

B. Engaging in a Pattern of Corrupt Activity

{¶35} In his first assignment of error, Kolle contends that the state presented insufficient evidence to support his conviction on Count One, engaging in a pattern of

corrupt activity. Kolle asserts that the state failed to prove at least two incidents of corrupt activity because "the jury instructions specifically limited the corrupt activities that could form the required pattern to 'aggravated trafficking, as charged herein,[']" "the jury was only instructed on two aggravated trafficking charges," and the jury acquitted him of one of those charges. He relies on *State v. Reyes,* 6th Dist. Wood No. WD-03-059, 2005-Ohio-2100, to support his position. Kolle notes that the Supreme Court of Ohio "has recognized that a conviction on a compound offense may stand although a jury acquits on its predicate offense." But he maintains this principle does not apply to a conviction for engaging in a pattern of corrupt activity because the definition of corrupt activity requires proof of specific conduct in connection with a predicate offense, and the court must instruct the jury on the predicate offenses at issue. Kolle also asserts that there is no evidence that he engaged in, attempted to engage in, conspired to engage in, or solicited, coerced, or intimidated another person to engage in aggravated trafficking as charged in Count Five. And he asserts Count Five does not meet the monetary threshold to qualify as a corrupt activity because the proceeds of the September 17th controlled buy were only $500.[3] The state conceded it presented insufficient evidence to support the conviction on Count One, but did not articulate the basis for this concession.

### 1. Relevant Statutory Provisions

**{¶36}** "The federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961 et seq., was the general model for Ohio's own corrupt-activity statute." *State v. Beverly,* 143 Ohio St.3d 258, 2015-Ohio-219, 37 N.E.3d 116, ¶ 3.

---

[3] We observe that under the first assignment of error, Kolle indicated one of the issues for review is: "Must the enhancement to first degree felony be vacated?" However, his argument regarding the first assignment of error does not address this issue.

Ohio's RICO statute, R.C. 2923.32(A)(1), provides: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *." "Whoever violates this section is guilty of engaging in a pattern of corrupt activity," which is a first-degree felony "if at least one of the incidents of corrupt activity is a felony of the first, second, or third degree." R.C. 2323.32(B)(1).

{¶37} R.C. 2923.31(I)(2)(c) defines "[c]orrupt activity" to include "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in" conduct constituting any violation of R.C. 2925.03

> when the proceeds of the violation, * * * or the value of the contraband or other property illegally possessed, sold, or purchased in the violation exceeds one thousand dollars, or any combination of violations described in division (I)(2)(c) of this section when the total proceeds of the combination of violations, * * * or value of the contraband or other property illegally possessed, sold, or purchased in the combination of violations exceeds one thousand dollars[.]

R.C. 2923.31(E) defines a "pattern of corrupt activity" as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

{¶38} "[F]or drug trafficking in violation of R.C. 2925.03 to constitute a corrupt activity the total proceeds of a violation of that statute or a combination of violations of that statute must exceed $1,000." *State v. Liggins*, 6th Dist. Sandusky No. 16 CAS 32, 2018-Ohio-243, ¶ 23, citing R.C. 2923.31(I)(2)(c). Thus, individual transactions can be aggregated to form a single corrupt activity. *See Liggins* at ¶ 23-24. However, "in order for the state to establish a pattern of corrupt activity it must produce evidence of at least

two corrupt activities where the proceeds of each corrupt activity exceeded $1,000." *Id.* at ¶ 23. "[A]t the minimum, the proceeds of [a] 'pattern of corrupt activity' must be at least $2,000.02, since the proceeds of each 'corrupt activity' must at least be $1,000.01." *Id.*

### 2. Impact of Count Five Not Guilty Verdict

**{¶39}** The trial court instructed the jury that "[c]orrupt activity means engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing or intimidating another person to engage in, aggravated trafficking in drugs, *as charged herein*. The value of the contraband or other property illegally possessed, sold, or purchased in the combination of violations must exceed $1,000." (Emphasis added.) The court also instructed the jury that Kolle was charged with aggravated trafficking in drugs in two counts, Counts Five and Nine. The jury found him not guilty of Count Five, but guilty of Count Nine and of engaging in a pattern of corrupt activity.

**{¶40}** The not guilty verdict on Count Five does not compel the conclusion that there is insufficient evidence to support the conviction for engaging in a pattern of corrupt activity. Kolle's reliance on *Reyes* is misplaced. In that case, the defendant was indicted on two counts of trafficking in cocaine and one count of engaging in a pattern of corrupt activity. *Reyes*, 6th Dist. Wood No. WD-03-059, 2005-Ohio-2100, at ¶ 2. A jury found him not guilty of one trafficking count, but guilty of the other two counts. *Id.* On appeal, he asserted there was insufficient evidence to convict him of engaging in a pattern of corrupt activity, and the appellate court agreed. *Id.* at ¶ 26. The appellate court explained:

> Pursuant to R.C. 2923.31(E), in order to find the appellant guilty of engaging in a pattern of corrupt activity, the jury had to find, beyond a reasonable doubt, that appellant committed two or more predicate acts that are not so closely related that they constitute the same event. The jury specifically found that the act upon which it found the appellant guilty of in Count 1 served as one of the predicate acts. However, the jury's explicit

not guilty verdict on Count 2 establishes that the state failed to prove its occurrence beyond a reasonable doubt. Finally, because the jury was not instructed as to the elements of *any* un-indicted offense, it could not find beyond a reasonable doubt, that appellant committed any un-indicted offense. * * *

In sum, with a not guilty verdict on Count 2, and no jury instruction as to any other offense that could serve as a predicate act, the state proved only one predicate act beyond a reasonable doubt. Because R.C. 2923.31(E) requires that the state prove the occurrence of two or more predicate acts beyond a reasonable doubt, there was insufficient evidence upon which the jury could convict appellant of engaging in a pattern of corrupt activity. * * *

(Emphasis sic.) *Id.* at ¶ 34-35.

**{¶41}** *Reyes* is not persuasive because it essentially holds that an acquittal on a predicate offense necessitates a finding of insufficient evidence on a compound offense. The Supreme Court of Ohio has "long recognized" that inconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 82 (plurality opinion), citing *State v. McNicol*, 143 Ohio St. 39, 47, 53 N.E.2d 808 (1944), citing *Griffin v. State*, 18 Ohio St. 438 (1868). The court has "reiterated" this principle by citing the holding in *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). *Gardner* at ¶ 82, citing *State v. Hicks*, 43 Ohio St.3d 72, 78, 538 N.E.2d 1030 (1989).

**{¶42}** In *Powell*, the United States Supreme Court explained that *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.E.356 (1932), "held that a criminal defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count." *Powell* at 58. This is because " '[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.' " *Id.* at 62, quoting *Dunn* at 393. " ' "The

most that can be said" ' " when there are inconsistent verdicts " ' "is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." ' " *Id.* at 63, quoting *Dunn* at 393, quoting *Steckler v. United States*, 7 F.2d 59, 60 (2d Cir.1925).

**{¶43}** *Powell* rejected the contention "that an exception to the *Dunn* rule should be made where the jury acquits a defendant of a predicate felony, but convicts on the compound felony." *Id.* at 67. The court explained that "the acceptability of this exception is belied by the facts of *Dunn* itself," because in that case "the defendant was acquitted of unlawful possession, and unlawful sale, of liquor, but was convicted of maintaining a nuisance by keeping unlawful liquor for sale at a specified place," and "the jury could not have convicted on the nuisance count without finding that the defendant possessed, or sold, intoxicating liquor." *Id.* at 67-68. Therefore, the proposed exception "threatens to swallow the rule." *Id.* at 68. Moreover, the argument

> that an acquittal on a predicate offense necessitates a finding of insufficient evidence on a compound felony count simply misunderstands the nature of the inconsistent verdict problem. Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, the argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury "really meant." This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent. The Government could just as easily—and erroneously—argue that since the jury convicted on the compound offense the evidence on the predicate offense must have been sufficient. The problem is that the same jury reached inconsistent results * * *.

> This problem is not altered when the trial judge instructs the jury that it must find the defendant guilty of the predicate offense to convict on the compound offense. Although such an instruction might indicate that the counts are no longer independent, if inconsistent verdicts are nevertheless reached those verdicts still are likely to be the result of mistake, or lenity, and therefore are subject to the *Dunn* rationale. * * *

*Id.* at 68.

> **{¶44}** *Powell* noted that
>
> a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. *This review should not be confused with the problems caused by inconsistent verdicts.* Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. *This review should be independent of the jury's determination that evidence on another count was insufficient.* The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.

(Citations omitted and emphasis added.) *Id.* at 67.

**{¶45}** Kolle has offered no convincing reason for us to depart from these principles in the context of a conviction for engaging in a pattern of corrupt activity. Therefore, we conclude that our sufficiency of the evidence review of Count One should be independent of the jury's determination on Count Five.

### 3. Evidentiary Analysis

**{¶46}** After viewing the evidence in a light most favorable to the prosecution, we conclude no rational trier of fact could have found the essential elements of engaging in a pattern of corrupt activity proven beyond a reasonable doubt. The state presented sufficient evidence from which the jury could have found that Kolle engaged in, attempted to engage in, conspired to engage in, or solicited, coerced, or intimidated another person to engage in aggravated trafficking in drugs as charged in Count Nine, see Section III.A.3, and that the proceeds of the violation exceeded $1,000. However, the state did not make a similar showing with respect to Count Five.

{¶47} The state presented evidence that on September 17, 2019, Kolle and Shea met in an alley, and Det. Hardee observed an exchange between them. However, Det. Hardee could not tell what was exchanged or whether both men had something to exchange. Subsequently, during the September 17th controlled buy, Shea made statements from which one can infer Kolle did not give him any drugs during the meeting because he became aware of the surveillance operation near his apartment. As a result, Shea was unable to sell Det. Lewis the promised three ounces of methamphetamine and could only sell him one ounce, which Shea "already had" and the source of which is unknown.

{¶48} There is some evidence that Kolle and Shea met a second time on September 17, 2019, and that Kolle gave Shea the substance he sold to Det. Lewis during the September 18th controlled buy.[4] During the September 18th controlled buy, Shea and Det. Lewis discussed how Shea's supplier was paranoid the day before, how Shea got the "stuff" sold to Det. Lewis from the "same guy," and how Shea should have gotten a discount for having to make a second trip "up there yesterday." However, the proceeds of the September 18th controlled buy were exactly $1,000, which is just below the monetary threshold for a corrupt activity under R.C. 2923.31(I)(2)(c).

{¶49} The state did not produce evidence of at least two corrupt activities. Therefore, it did not present sufficient evidence to support Kolle's conviction for engaging in a pattern of corrupt activity. Accordingly, we sustain the first assignment of error,

---

[4] We recognize there were separate charges for aggravated trafficking in drugs and aggravated possession of drugs on or about September 18, 2019, i.e., Counts Seven and Eight, which were dismissed prior to trial. However, the jury was instructed that the relevant timeframe for Count Five was "on or about" September 17, 2019, and events related to the September 18th controlled buy are within that timeframe.

reverse and vacate the conviction on Count One, and remand to the trial court to enter a judgment of acquittal on Count One.

## IV. ADMISSIBILITY OF EVIDENCE

{¶50} In his third assignment of error, Kolle contends that the trial court erred when it allowed Lt. Strawser to testify about money allegedly recovered during the execution of the search warrant and admitted into evidence Exhibit 12, a photograph of that money. Kolle asserts Lt. Strawser did not have personal knowledge of the search and seizure of the money because he was across the street when that happened, and his testimony that the money was recovered from Kolle was based on information from the Franklin County Sheriff's Office. Kolle also contends that the state did not properly authenticate Exhibit 12 under Evid.R. 901. He asserts that the state tried to authenticate Exhibit 12 using the pictorial testimony theory, but failed because Lt. Strawser could not testify to details about the recovery of the money as he was not present when that occurred. He also asserts Lt. Strawser's testimony about seeing the money at the SIU office is not credible because he "clearly lied about being present and participating in the search." Kolle maintains that there is therefore "no direct testimony or evidence establishing that the money in the photograph was recovered from the search of [his] apartment." Kolle also asserts the admission of the photograph instead of the actual money violates Evid.R. 1003 and Crim.R. 41(D)(1).

### A. Standard of Review

{¶51} " 'The admission or exclusion of evidence generally rests within a trial court's sound discretion.' " *State v. Allen*, 4th Dist. Ross No. 21CA3736, 2022-Ohio-1180, ¶ 21, quoting *State v. McCoy*, 4th Dist. Pickaway No. 19CA1, 2020-Ohio-1083, ¶ 20.

" 'Thus, absent an abuse of discretion, an appellate court will not disturb a trial court's ruling regarding the admissibility of evidence.' " *Id.*, quoting *McCoy* at ¶ 20. An abuse of discretion is "an unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken." *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23.

### B. Lt. Strawser's Testimony

**{¶52}** Evid.R. 602 states: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." " 'Personal knowledge' is '[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said.' " *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707, ¶ 26, quoting *Black's Law Dictionary* 875 (7th Ed.Rev.1999). "Thus, ' "[t]he subject of a witness's testimony must have been perceived through one or more of the senses of the witness," ' and a witness is incompetent to testify to any fact ' "unless he or she possesses firsthand knowledge of that fact." ' " *State v. Teets*, 4th Dist. Pickaway No. 17CA21, 2018-Ohio-5019, ¶ 28, quoting *Bonacorsi* at ¶ 26, quoting *Weissenberger's Ohio Evidence*, Section 602.1, at 213 (2002).

**{¶53}** The trial court abused its discretion when it allowed Lt. Strawser to testify about where the money depicted in Exhibit 12 was found. Lt. Strawser did not find the wallet or any of the money and was not in Kolle's apartment when those items were discovered or seized. Lt. Strawser was across the street from Kolle's apartment. Even though Lt. Strawser testified that someone from the Franklin County Sheriff's Office told him that the money was found on Kolle, Evid.R. 602 precludes a witness "from testifying

to the truth of the subject matter of [a] hearsay statement if [the witness] has no personal knowledge of it."  1980 Staff Note, Evid.R. 602.

## C.  Exhibit 12

### 1.  Authentication

**{¶54}** "Before a trial court may admit evidence, Evid.R. 901 requires the proponent to identify or authenticate the evidence." *State v. Stapleton*, 4th Dist. Pickaway No. 19CA7, 2020-Ohio-4479, ¶ 34.   Evid.R. 901(A) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  " 'This threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity.' "  *State v. Spencer*, 4th Dist. Pickaway No. 19CA6, 2019-Ohio-3800, ¶ 14, quoting *State v. Pyles*, 4th Dist. Scioto No. 17CA3790, 2018-Ohio-4034, ¶ 48.   "The proponent of the evidence need only show a reasonable likelihood of authenticity."  *Id.*, citing *Pyles* at ¶ 48.

**{¶55}** "Two of the methods for authenticating photographic evidence" are the pictorial testimony theory and silent witness theory.  *Midland Steel Prods. Co. v. Internatl. Union, United Auto., Aerospace & Agricultural Implement Workers of Am., Local 486*, 61 Ohio St.3d 121, 129-130, 573 N.E.2d 98 (1991).  Under the pictorial testimony theory, " 'the photographic evidence is merely illustrative of a witness' testimony and it only becomes admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness' personal observation.' " *Id.* at 129, quoting *Fisher v. State*, 7 Ark.App. 1, 5, 643 S.W.2d 571 (1982).  Under the silent witness theory, " 'the photographic evidence is a "silent witness" which speaks for itself,

and is substantive evidence of what it portrays independent of a sponsoring witness.' " *Id.* at 130, quoting *Fisher* at 6.  The "photographic evidence may be admitted upon a sufficient showing of the reliability of the process or system that produced the evidence." *Id.* at paragraph three of the syllabus.  However, Evid.R. 901 does not limit the means by which evidence may be authenticated, and we have recognized that " '[c]ircumstantial, as well as direct, evidence may be used to show authenticity.' " *Spencer* at ¶ 14, quoting *State v. Vermillion*, 4th Dist. Athens No. 15CA17, 2016-Ohio-1295, ¶ 14.

{¶56}  " 'Chain of custody is a part of the authentication and identification mandate set forth in Evid.R. 901, and the state has the burden of establishing the chain of custody of a specific piece of evidence.' "  *State v. Corder*, 2012-Ohio-1995, 969 N.E.2d 787, ¶ 15 (4th Dist.), quoting *State v. Brown,* 107 Ohio App.3d 194, 200, 668 N.E.2d 514 (3d Dist.1995).  However, the state's burden " 'is not absolute.' "  *Id.*, quoting *Brown* at 200.  The state is "not required to present the testimony of every individual who might have handled the evidence."  *Id.* at ¶ 20.  "[A] chain of custody may be established by direct testimony or by inference."  *State v. Hardesty*, 5th Dist. Stark No. 2018CA00178, 2020-Ohio-246, ¶ 33.  " 'The state need only establish that it is reasonably certain that substitution, alteration or tampering did not occur.' "  *Corder* at ¶ 15, quoting *State v. Blevins,* 36 Ohio App.3d 147, 150, 521 N.E.2d 1105 (10th Dist.1987).

{¶57}  " '[E]ven if the chain of custody is broken, that fact alone will not render the evidence inadmissible.' "  *Corder* at ¶ 15, quoting *State v. Lenoir*, 5th Dist. Delaware No. 10CAA010011, 2010-Ohio-4910, ¶ 19.  Generally, " 'breaks in the chain of custody go not to the admissibility of evidence, but to the weight afforded it.' "  *Id.* at ¶ 15, quoting *Blevins* at 150.  "Before a break in the chain will prevent an item from being admitted into

evidence, that break must be very substantial because the standard for a court to admit evidence under Evid.R. 901(A)-*i.e.,* proof 'sufficient to support a finding' that the evidence is what its proponent claims it to be-is a very low threshold, considerably less demanding" than the burden of proof beyond a reasonable doubt. *State v. Winfield*, 4th Dist. Ross No. 1641, 1991 WL 28291, *2 (Feb. 7, 1991).

{¶58} In this case, the state presented evidence sufficient to support a finding that Exhibit 12 is what the state claimed it to be—a photograph of $2,030 from the September 24th controlled buy money which was found during the execution of the search warrant. As previously explained, during the September 18th controlled buy, Shea made statements indicating he intended to reach out to Kolle to supply four to six ounces of methamphetamine Det. Lewis wanted the following week. There is evidence that on September 24, 2019, Lt. Strawser gave Det. Lewis $2,800, and Det. Lewis gave that money to Shea at Love's around 4:40 p.m. There is evidence that after the money exchange, Shea went to Kolle's apartment building and climbed the stairs to the second floor, which is where Kolle's apartment was located. Afterwards, Shea returned to Love's and gave Det. Lewis a bag containing a crystal-like substance which was supposed to be the promised six ounces of methamphetamine. The next morning, Lt. Strawser saw members of the Franklin County SWAT team enter Kolle's apartment to execute a search warrant. Although no witness with personal knowledge testified that any of the buy money was found on Kolle or in his apartment, Det. Strawser gave testimony indicating he personally saw the SWAT team remove Kolle from the apartment and saw Det. Hardee put a wallet in a bag at the scene. And directly after the search, Det. Strawser saw Det. Hardee remove money from the wallet at SIU, saw the serial numbers on that money,

and determined it came from the September 24th controlled buy by comparing the serial numbers in pictures of the buy money to the serial numbers in pictures of money from the wallet.   Therefore, even though there is a break in the chain of custody because it is unknown who found and handled the money prior to Det. Hardee, the state showed a reasonable likelihood that the money depicted in Exhibit 12 came from the September 24th controlled buy and was found during the execution of the search warrant.

## 2.  Originals vs. Duplicate

**{¶59}** Evid.R. 1002 states:   "To prove the content of a writing, recording, or photograph, the original * * * is required, except as otherwise provided in these rules * * *."  Writings include numbers set down by printing.  Evid.R. 1001(1).  An "original" is the writing "itself or any counterpart intended to have the same effect by a person executing or issuing it."  Evid.R. 1001(3).  A "duplicate" includes "a counterpart" produced "by means of photography."  Evid.R. 1001(4).  "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."  Evid.R. 1003.  "The party seeking to exclude a duplicate has the burden of demonstrating that the duplicate should be excluded."  *State v. Tibbetts*, 92 Ohio St.3d 146, 160, 749 N.E.2d 226 (2001).

**{¶60}** Kolle has not met this burden. The bills depicted in Exhibit 12 qualify as writings because they contain numbers, i.e., serial numbers, set down by printing.  Instead of presenting the original bills at trial, the state presented a duplicate of them—a single photograph of all the bills together.  Defense counsel did not raise a genuine question as to the authenticity of original bills.   And while Exhibit 12 is slightly blurry, the serial

numbers are legible, so the blurriness is not a circumstance which would make it unfair to admit the duplicate in lieu of the originals.  Moreover, Crim.R. 41(D)(1) is inapplicable. It states:  "Property seized under a warrant shall be kept for use as evidence by the court which issued the warrant or by the law enforcement agency which executed the warrant." Crim.R. 41(D)(1).  This provision does not require the state to present the property seized at trial or preclude the state from presenting a photograph in lieu of the evidence itself. Accordingly, we conclude that the trial court did not abuse its discretion when it admitted Exhibit 12 into evidence.

### D.  Harmless Error Analysis

{¶61}  Because the trial court erred by admitting some of the challenged evidence, i.e., Lt. Strawser's testimony about where law enforcement found the money depicted in Exhibit 12, we must assess whether that error was harmless.  Crim.R. 52(A) states:  "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."  The Supreme Court of Ohio has established the following analysis "to guide appellate courts in determining whether an error has affected the substantial rights of a defendant, thereby requiring a new trial":

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict.  Second, it must be determined whether the error was not harmless beyond a reasonable doubt.  Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

(Citations omitted.)  *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.  "Under the harmless-error standard of review, 'the *government* bears the burden of demonstrating that the error did not affect the substantial rights of the defendant.' " (Emphasis sic.)  *Id.* at ¶ 36, quoting *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297,

802 N.E.2d 643, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). "An appellate court must reverse a conviction if the government does not satisfy this burden; unlike Crim.R. 52(B), Crim.R. 52(A) is mandatory, not permissive, and thus affords the appellate court no discretion to disregard the error." *Perry* at ¶ 15.

**{¶62}** The state has not satisfied its burden. In overruling the Crim.R. 29 motion Kolle made at the close of the state's case, the trial court characterized evidence that money from the September 24th controlled buy was found on Kolle as the "most damning" evidence against him, stating: "[I]t's been established to me that the most damning is finding the buy money * * * on [Kolle's] person the next day. It shows that he's in this up to his eyeballs in terms of his participation in this enterprise." The prosecutor emphasized this evidence in closing arguments, stating, "And at the end of the day, where was our buy money? On this defendant," and, "[O]n the 24th, what do you have? You've got $2,030 of our $2,800. And where is it? It's with the defendant." Other than Lt. Strawser's inadmissible testimony, there is no evidence that the money was found on Kolle himself. And while we have concluded the state presented sufficient evidence to authenticate Exhibit 12 as depicting a portion of the buy money which was found during the execution of the search warrant at Kolle's apartment, the burden to authenticate evidence is "considerably less demanding" than the burden to prove guilt beyond a reasonable doubt. *Winfield*, 4th Dist. Ross No. 1641, 1991 WL 28291, at *2.

**{¶63}** In its appellate brief, the state does not present this court with any argument as to how the error in the admission of Lt. Strawser's testimony about where the money was found constitutes harmless error under Crim.R. 52(A). Instead, the state maintains

that Lt. Strawser did not testify outside his personal knowledge, which is not the case as we explained in Section IV.B. Consequently, the state has not met its burden to demonstrate that the error in this case did not affect Kolle's substantial rights.

### E. Conclusion on Third Assignment of Error

**{¶64}** We overrule the third assignment of error to the extent it challenges the admission of Exhibit 12. However, we sustain the third assignment of error to the extent it challenges the admission of Lt. Strawser's testimony about where law enforcement found the money depicted in that exhibit. Because the state failed in its burden to demonstrate that this error did not affect Kolle's substantial rights, we reverse and vacate the conviction on Count Nine and remand for a new trial on that count.

### V. SUMMARY

**{¶65}** We sustain the first assignment of error, overrule the second assignment of error, and sustain in part and overrule in part the third assignment of error. We affirm in part and reverse in part the trial court's judgment, vacate the convictions, and remand to the trial court to enter a judgment of acquittal on Count One and conduct a new trial on Count Nine.

JUDGMENT AFFIRMED IN PART
AND REVERSED IN PART.
CAUSE REMANDED

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED. Appellant and appellee shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.

For the Court

BY: _____
Michael D. Hess, Judge

### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**